2013 CO 3

Concerning the Application for Water Rights of: Ginn Battle South, LLC, Ginn Battle North, LLC, Ginn–LA Battle One, LTD., LLLP, Ginn–LA Battle One A, LLC and Ginn Development Company, LLC in Eagle County, Colorado Concerning the Application for Water Rights of: Town of Minturn in Eagle, Grand and Pitkin Counties, Colorado,

The TOWN OF MINTURN,
Applicant–Appellee

v.

J. TUCKER, Trustee, Opposer–Appellant

and

Water Division 5 Engineer, Appellee
Pursuant to CAR 1(e)

and

Concerning the Application for Water Rights of the Town of Minturn in Eagle County, Colorado,

The Town of Minturn, Applicant–Appellee

v.

J. Tucker, Trustee, Opposer–Appellant

and

Water Division 5 Engineer, Appellee
Pursuant to C.A.R. 1(e).

No. 11SA169.

Supreme Court of Colorado,
En Banc.

Jan. 22, 2013.

rehearing Denied Feb. 11, 2013.*

582 

 
 
 
 
 
 
 
 
 

 
 
 
 
 

 
 
 
 
 
 
 

 
 
 
 
 
 
 
 

 
 
 

* Justice Coats and Justice Eid would grant the petition.

Arthur B. Ferguson, Jr., Holland & Hart LLP, Aspen, Colorado, Meghan N. Winokur, Holland & Hart LLP, Denver, Colorado, Attorneys for Applicant–Appellee.

J. Tucker, Trustee, Arlington, VA, Opposer–Appellant, Pro Se.

No Appearance by or on behalf of Water Division 5 Engineer.

Justice HOBBS delivered the Opinion of the Court.

¶ 1 In these related appeals from the District Court for Water Division No. 5 ("the water court"), we review the water court's entry of corrected decrees concerning the Town of Minturn's ("Minturn's") applications for water rights.[1] This case arises from Minturn's separate applications for changes of water rights and for new water rights filed in 2005 and 2007. Following the combined entry of over thirty Opposers to Minturn's applications, Minturn negotiated and ultimately entered into a series of agreements with all the Opposers, including J. Tucker, Trustee's ("Tucker's") predecessors in interest Battle Mountain Corporation, Battle Mountain Limited Liability Company, and Sensible Housing Co., Inc. Stipulations signed by Tucker's predecessors contained a provision stating that they would not oppose entry of water court decrees containing terms and conditions "no less restrictive" than those set forth in the parties' stipulations. In regard to monthly limitations to be contained in the decrees, the stipulations provided for a consumptive use accounting "based on the historical actual use of applicant." Following the water court's entry of the original decrees, Minturn realized that several monthly consumptive use numbers in those decrees did not reflect the actual monthly historical use numbers attributable to exercise of the town's water rights. Instead, they were derived from billing statements provided by the Eagle River Water and Sanitation District that run a month behind the actual month of use. Minturn petitioned the water court to correct the decrees, using the actual use numbers by month of use. Of all the Opposers, only Tucker opposed the decree corrections. After receiving briefs and affidavits from both parties, the water court granted the petitions and entered the corrected decrees.

¶ 2 Based upon the record in these proceedings, we uphold the corrected findings of fact, conclusions of law, judgment, and decrees of the water court. Section 37–92–304(10), C.R.S. (2012), grants the water court discretion within a three-year period to correct substantive errors in a water decree. The parties' stipulations anticipated that actual monthly historical consumptive use numbers would be utilized in the decrees' monthly limitations. The original decrees mistakenly did not contain these numbers, contrary to the intent of the parties. The water court did not abuse its discretion in entering the corrected decrees. Accordingly, we affirm the water court's judgment.

# I.

¶ 3 This case stems from Minturn's 2005 application for changes of water rights (Case No. 05CW262)[2] and its 2007 application for

---

1. The issues that J. Tucker, Trustee, presents for review are:
 1. Whether the Water Court erred in determining that Applicant's mistake, in deliberately agreeing to the Stipulation/contract, attained the status of a "clerical error" despite the denunciation of a clerical mistake by a signatory party?
 2. Whether the Water Court erred in granting Applicant's petition to unilaterally rewrite the Stipulation, stipulated judgment and decree such that the "Monthly Maximum Limitations" for the months of June (4.75 acre feet higher) and July (1.50 acre feet higher) would become less restrictive than the limitations incorporated in the Stipulation/contract where a signatory party objects to the diminution of its bargain?
 3. Whether the Water Court erred in denying Opposer a reasonable continuance to take discovery after Applicant set forth a new argument attaching new exhibits and a new affidavit to its reply, which were not propounded in Applicant's initial "clerical error" petition to the court?

 The Town of Minturn offers the following reframing of Tucker's issues presented for review:
 1. Did the water court clearly err in determining that the proposed corrected decrees were consistent with the terms and conditions of the stipulations between Minturn and Trustee's predecessors and, therefore, did the water court act within its authority under C.R.S. § 37–92–304(10) when it granted Minturn's petitions to correct substantive errors in the original decrees and entered the corrected decrees?
 2. Did the water court act within its discretion and consistent with due process in denying Trustee's motions for discovery to take the deposition of Minturn's professional engineer during briefing on Minturn's petitions?

2. Case No. 05CW262 was consolidated with Case No. 05CW263.

new water rights, approval of a plan for augmentation, including exchange, and conditional appropriative rights of exchange (Case No. 07CW225).[3] Minturn is a home rule municipality in Eagle County, Colorado. The subject water rights divert from the Cross Creek and Eagle River watersheds in Eagle County. Under a contractual arrangement, the Eagle River Water and Sanitation District is responsible for billing Minturn customers for water and trash services [4] and provides that district augmentation water to assist Minturn among other sources of augmentation water in the exercise of its water rights under the decrees.

¶ 4 In its 2005 application, Minturn sought approval of alternate points of diversion for water rights in the Minturn Ditch and Minturn Well Nos. 1 and 2. In 2007, Minturn sought approval of new conditional surface and ground water rights, a plan for augmentation, including exchanges, and conditional rights of exchange. The plan for augmentation, including exchanges, is to provide Minturn with a long-term, reliable source of municipal water in addition to its senior water rights in the Minturn Ditch and Minturn Wells.

¶ 5 Over thirty parties ("Opposers") filed Statements of Opposition to Minturn's applications. These Opposers included appellant Tucker's predecessors in interest: Battle Mountain Corporation ("BMC") in Case No. 05CW262, and Battle Mountain LLC, Sensible Housing Co., Inc., and BMC in Case No. 07CW225.[5] Tucker substituted as Opposer for Battle Mountain LLC, Sensible Housing Co., Inc., and BMC in both cases in December of 2010.

¶ 6 Tucker's predecessors in interest agreed to the following provision regarding entry of Minturn's proposed water rights decrees:

> Opposers will not oppose the entry of a ruling and decree in this matter provided that said ruling and decree contains terms and conditions that are *no less restrictive* than those set forth in the decree attached hereto as Exhibit A.

(Emphasis added). The water court granted Minturn's applications and entered the original decrees on July 12, 2010, (Case No. 05CW262) and October 5, 2010 (Case No. 07CW225).

¶ 7 The original decrees defined the rights and obligations of the parties across a wide range of conditions. Relevant here, the original decrees set forth annual and monthly consumptive use limitations and specified the factors used to calculate Minturn's consumptive use relative to these limitations. Specifically, the decrees provided, in relevant part,

> *Monthly Maximum Limitations.* Collectively, the diversion of the 38 consumptive acre feet per year from the Minturn Ditch Water Right and Minturn Well Nos. 1 and 2 Water Rights shall be limited to the following monthly maximum amounts:
>
> A maximum of 0.75 consumptive acre feet per month during the months of November through March.
>
> A maximum of 1.5 consumptive acre feet during April.
>
> A maximum of 5.0 consumptive acre feet per month during the months of May and June.

---

3. Case No. 07CW225 was consolidated with Case. No. 06CW264.

4. Eagle River Water & Sanitation District, Map and Overview, http://www.erwsd.org/our-organization/service-area (last visited Dec. 27, 2012).

5. Other Opposers included Arrowhead Metropolitan District, Town of Avon, City of Aurora, Beaver Creek Metropolitan District, Berry Creek Metropolitan District, Clinton Ditch & Reservoir Company, Colorado Conservation Board, Colorado Division of Wildlife, Colorado River Water Conservation District, Colorado Water Conservation Board, Division 5 Engineer, Eagle Colorado

Board of County Commissioners, Eagle County School District Re–50J, Eagle Park Reservoir Company, Eagle River Water & Sanitation District, Eagle–Vail Metropolitan District, Edwards Metropolitan District, Flattops Water Co., LLC, Four Creek Ditch Company, Ginn Battle South, LLC, Ginn Battle North, LLC, Ginn–LA Battle One, LTD., LLP, Ginn–LA Battle One A, LLC, City of Golden, Town of Gypsum, Holland Creek Metropolitan District, Public Service Co. of Colorado, Town of Redcliff, Red Sky Ranch Metropolitan District, State & Division Engineers, State Engineer, State Board of Land Commissioners, Upper Eagle Regional Water Authority, USDA Forest Service, Vail Associates, Inc., and Vidler Water Company, Inc.

A maximum of 10.0 consumptive acre feet per month during the months of July and August; provided, however, that the maximum amount during June, July and August shall not exceed 22.5 consumptive acre feet. A maximum of 7.0 consumptive acre feet during September.

A maximum of 4.0 consumptive acre feet during October.

*Consumptive Use Factors.* For purposes of calculating the annual and monthly maximum consumptive use limits, Minturn will measure all diversions from the Minturn Ditch Water Right and Minturn Wells Nos. 1 and 2 Water Rights at all points of diversion. Total metered use (the total of the individual meters) during the months of November through March shall be considered inhouse uses with a consumptive use factor of 5%. The portion of the total metered use during the months of April through October that exceeds the average of the preceding November through March monthly metered use shall be considered irrigation water use with a consumptive use factor of 85%.

¶ 8 Following entry of the decrees, however, Minturn realized that some of the consumptive use numbers provided to Minturn by the Eagle River Water and Sanitation District and incorporated into the monthly maximum limitations did not reflect actual monthly usage data. Instead, the listed numbers incorrectly stated Minturn's use contained in billing statements. Billing to customers is done by the Eagle River Water and Sanitation District and runs a month behind the actual usage month. As stated by Minturn's consulting water resources engineer, Joe Tom Wood, P.E.:

3. After the final decree was entered, [Minturn] conferred with me regarding certain errors in the decree that arise from engineering issues and accounting mistakes. The errors relate to some of the consumptive use limitations in Paragraph 11.C of the decree and a factor used to determine those limitations in Paragraph 11.F of the decree.

4. I investigated the source and nature of these engineering issues and determined that they related to a misunderstanding of the underlying water use information provided by the Eagle River Water and Sanitation District to our office, which was thereafter relied upon by both the Arrowhead Objectors and the Town in negotiating the monthly consumptive use limitations to be used for purposes of calculating those limitations. Such limitations were calculated to correspond with historical water usage by the Town in order to allow some future use of the senior water right owned by the Town and to cap the use of such right, particularly in the irrigation season.

5. After forming an accurate understanding of the underlying water use information, I analyzed the Town's water use data to determine what corrected consumptive use limitations would properly correlate to the Town's actual usage on a monthly basis to achieve the goal of the negotiations.

¶ 9 While this error did not affect the agreed-upon annual consumptive use limitation of 38 acre-feet, it affected the parties' expectation that the decrees would include monthly limitations and factors based on actual monthly usage figures.

¶ 10 Minturn also realized that the month of April was not included as a "winter month" in the "consumptive use factors" section due to a drafting error in a prior settlement agreement that was later carried over into its stipulated decrees. Consequently, the determination of consumptive use factors as reflected in the original decrees was inconsistent with the fact that Minturn's total metered use during the month of April is considered "inhouse" use.

¶ 11 After identifying these errors, Minturn determined that the following corrections were necessary to accord with the expectation of the parties:

*Monthly Maximum Limitations.* Collectively, the diversion of the 38 consumptive acre feet per year from the Minturn Ditch Water Right and Minturn Well Nos. 1 and 2 Water Rights shall be limited to the following monthly maximum amounts:

A maximum of 0.75 consumptive acre feet per month during months of November through March.

A maximum of *1.0* consumptive acre feet during April.

A maximum of *3.5* consumptive acre feet during May.

A maximum of *9.75* consumptive acre feet during June.

A maximum of *11.5* consumptive acre feet during July.

A maximum of *8.5* consumptive acre feet during August; provided, however, that the maximum amount during June, July and August shall not exceed *27.5* consumptive acre feet.

A maximum of *5.0* consumptive acre feet during September.

A maximum of *2.25* consumptive acre feet during October.

*Consumptive Use Factors.* For purposes of calculating the annual and monthly maximum consumptive use limits, Minturn will measure all diversions from the Minturn Ditch Water Right and Minturn Wells Nos. 1 and 2 Water Rights at all points of diversion. Total metered use (the total of the individual meters) during the months of *November through April* shall be considered inhouse uses with a consumptive use factor of 5%. The portion of the total metered use during the months of *May through October* that exceeds the average of the preceding *November through April* monthly metered use shall be considered irrigation water use with a consumptive use factor of 85%.

(Emphasis added).

¶ 12 Under the corrected decrees, Minturn's total annual use for the Minturn Ditch and Well Nos. 1 and 2 remains limited to 38 consumptive acre-feet per year and its allocated water use during irrigation season is 1.0 acre-foot less than that reflected in the original decrees. The June and July maximum limitations are adjusted up by 4.75

acre-feet and 1.5 acre-feet, respectively, and are offset by reductions of 0.5 acre-feet in April, 1.5 acre-feet in May, 1.5 acre-feet in August, 2.0 acre-feet in September, and 1.75 acre-feet in October.

¶ 13 Minturn conferred with all Opposers concerning the proposed corrected decrees. All Opposers excepting Tucker, who had succeeded to Battle Mountain LLC, Sensible Housing Co., Inc., and BMC's interest in the case, agreed to the proposed changes. Tucker, however, opposed the changes on the ground that the parties' earlier stipulations precluded the water court from making the requested adjustments.

¶ 14 Minturn filed its "Petition[s] to Correct Substantive Errors in Decree[s]" in both cases on March 15, 2011. The petitions explained the errors to the water court, outlined Minturn's requested changes, and requested the court to correct the petitions pursuant to section 37–92–304(10).[6]

¶ 15 Tucker objected to Minturn's petitions, contending that the requested changes constituted an improper and unilateral attempt to modify the stipulations entered into with Tucker's predecessors in interest. He contended that the terms of the stipulations were clear and unambiguous and the water court's rewriting of these terms would be "prejudicial ... because of the substantial discussions, negotiations, and compromises not to mention the funds expended during five years of litigation."

¶ 16 Minturn replied that it was not requesting a "modification" of the stipulation at all, but rather was requesting "corrections" to the original decrees consistent with the terms of those stipulations. More particularly, Minturn asserted that its stipulations with Tucker's predecessors included a representation that the parties would "not oppose the entry of a ruling and decree in this matter, provided that said decree contains terms and

---

**6.** Minturn's petition in Case No. 07CW225 recites, as does the petition in Case No. 05CW262, that:

> The Town recently discovered that the ERWSD data provided to the Town reflected use by billing month instead of the month of actual use. As a result, the limitations on the senior water rights were based upon records that were in fact one month off, e.g. the June rec-

ords relied upon were actual use records for May and billed in June. The decreed limitations in [the stipulation], based on the billing records, do not and will not properly correlate to the actual usage by the Town on a monthly basis and the accounting for the same has and will have unintended and adverse results for the Town. The limitations for the winter months are not affected.

conditions that are *no less restrictive upon the Applicant* than those set forth in the proposed decree attached" to the stipulations. (Emphasis added). Accordingly, if the proposed corrected decrees contained terms and conditions "no less restrictive" than those in the original stipulations, they were "consistent" with those stipulations. Minturn argued that, if the water court were to determine the proposed corrected decrees contained terms "no less restrictive" than the original stipulations, Tucker would be precluded from objecting to their adoption by the water court.

¶ 17 In the corrected decree proceedings, both Minturn and Tucker submitted affidavits to the water court. Minturn submitted affidavits by Joe Tom Wood, a state-licensed engineer and consulting water resources engineer for the Town of Minturn. Wood's affidavits recounted his personal knowledge of the case and stated that, in his professional opinion, the corrected limitations—when viewed in the proper context of the ebb and flow of actual stream conditions—were more, rather than less, restrictive on the town. As noted above, Wood attested that (1) after the initial decrees were entered, Minturn conferred with him regarding errors in the decrees pertaining to consumptive use limitations and factors used to determine those limitations; (2) he investigated the source of the errors and determined that they related to a misunderstanding of the underlying water use information provided by the Eagle River Water and Sanitation District, which Minturn subsequently relied on in listing the monthly consumptive use limitations in the proposed original decrees, (3) the limitations were intended to correspond with Minturn's historical water usage in order to allow some future use of its senior water right and to cap the use of such right, particularly in the irrigation season; and (4) after forming an accurate understanding of the underlying water use information, he analyzed Minturn's water use data to determine what corrective consumptive use limitations would correlate to Minturn's actual monthly usage in order to meet the intent of the stipulations. Wood then listed the specific monthly maximum limitations that would correspond to Minturn's actual monthly usage, and stated that

the corrected monthly limitations are only higher in the original decrees in the months of June and July when there is more water available in the stream system and these higher consumptive use amounts are offset by reduction of consumptive use amounts in other months. Finally, Wood stated that, in regard to the factors used to determine the consumptive use limitations, April was included as an inhouse use month in the engineering analyses forming the basis of the consumptive use limitations, but was erroneously not included as a "winter month" in the final decree.

¶ 18 Following Minturn's submission of the Wood affidavits, Tucker filed responses in both cases in which he highlighted Wood's statement that the monthly limitations for June and July were higher than those set forth in the original decrees. He did not counter with the affidavit of an expert. Instead, he submitted his own affidavit simply asserting that the proposed changes were less restrictive on Minturn and would be prejudicial to Tucker:

4. Affiant has read the affidavit of Joe Tom Wood, P.E. dated April 8, 2011 and Affiant agrees with paragraph 6e and 6f on page 2 of the Wood Affidavit which states that the proposed corrected limitations for June and July would be "higher than the decreed limitation." which Battle Mountain Corporation negotiated. Minturn's proposed corrected limitations are less restrictive upon Minturn then [sic] the restrictive limitations negotiated by Battle Mountain Corporation and incorporated into the stipulation and contract.

5. In my opinion the proposed corrected limitations are less restrictive on Minturn and Battle Mountain Corporation would be prejudiced by the rewriting of the stipulation and contract.

¶ 19 Minturn then filed additional responses and attached supplemental affidavits setting forth Wood's opinions in greater detail. For example, Wood attached a table displaying the monthly and average annual stream flows at three gaging stations in the vicinity of Minturn over an eighteen- to twenty-year period. He stated that, although the pro-

posed corrected June limitation is 4.75 acre-feet larger than the originally-decreed limitation, the data set forth in the table shows that June is a "flow" stream condition, when the stream flows at the three gages are higher than any other month of the year. For example, the table shows that the historical average stream flow volumes at the three gaging stations for the month of June are 13,272 acre-feet, 27,511 acre-feet, and 88,490 acre-feet, respectively. These values represent increases of 4659, 3670, and 16,867 acre-feet, respectively, over the historical average stream flow volumes for the month of May. Thus, according to Wood, there is more available stream flow in June to satisfy the demands of water users and the in-stream flow rights of the Colorado Water Conservation Board. Also, the month of July is a "flow" stream condition with relatively large stream flows at all three gages. The effect of the corrected limitations is to place a larger consumptive use number for Minturn upon the stream system for June and July when stream flow is abundant, and, correspondingly, place a smaller number for Minturn on the stream system when stream flow is less abundant in August, September, and October. Based on these facts, Minturn asserted that the proposed corrected decrees are no less restrictive on Minturn than the initial decrees.[7]

¶ 20 Tucker did not counter any of the expert data or assumptions contained in the Wood affidavits, nor did he request an evidentiary hearing. The water court accepted Wood's data and granted Minturn's petition in Case No. 07CW225 on May 4, 2011. Tucker later filed a Motion for Extension of Time to Take Deposition Based on Newly Filed Affidavit, which the water court denied. In Case No. 05CW262, Tucker filed a nearly identical motion prior to issuance of the water court's order granting Minturn's petition, which the court also denied. The water

court granted Minturn's petition in Case No. 05CW262 on July 13, 2011. In both cases, the water court entered the corrected decrees as proposed by Minturn.

¶ 21 In Tucker's various supplemental filings, he asserted that he had no opportunity to discover the bases upon which Wood relied for the truth or context of his assertions, and that Tucker would be prejudiced by the denial of deposition in aid of discovery. Tucker's supplemental affidavit also characterized Wood's representations as based on a "methodology foreign to the stipulation contract of the parties, which Battle Mountain negotiated." He then restated his belief that the proposed corrected limitations were less restrictive on Minturn. He did not set forth any information showing injury to any water rights he allegedly had an interest in.

¶ 22 Tucker now appeals from the orders granting the petitions and from entry of the corrected decrees, and from the orders denying his motions for discovery. He asserts that Minturn is subject to specific monthly maximum limitations via the initial decrees entered into pursuant to the stipulations with his predecessors in interest, and the water court failed to enforce the unambiguous terms of these stipulations. He further contends, as "an alternative or supplemental argument," that the water court erred in denying him a reasonable continuance to take discovery after Minturn set forth "a new argument attaching new exhibits and a new affidavit to its replies," which were not propounded in its initial petitions.

¶ 23 In turn, Minturn asserts that (1) the water court was authorized to correct the substantive errors in the initial decrees pursuant to section 37-92-304(10); (2) the court correctly interpreted the stipulations as permitting corrections to the decrees so long as the terms and conditions of the corrected decrees were "no less restrictive" than those

---

7. Wood further stated that the front-loading of the limitations onto June and July is also no less restrictive because the threshold for Minturn having to use its junior rights decreed in Case No. 07CW225 and to augment said junior rights will be lowered by the corresponding decrease in Minturn's ability to use its senior water rights as articulated in this Case No. 05CW262 as a result of the decreased consumptive use limitations for August, September, and October. For the same reason, according to Wood, the increase in the corrected June–July–August limitation to 27.5 acre-feet from the decreed 22.5 acre-feet falls upon the two "flow" months of June and July, while a decrease occurs in the "ebb" month of August, and the corrected June–July–August limitation is therefore no less restrictive.

in the original decrees; (3) the court correctly determined that the proposed changes were in fact "no less restrictive" than the original decrees, and it correctly interpreted the "no less restrictive" language as requiring a comparison between the original and corrected limitations on an annual or irrigation-season basis, rather than on a monthly basis; and (4) the court acted within its discretion in denying Tucker's motions for discovery.

## II.

¶ 24 Based upon the record in these proceedings, we uphold the corrected findings of fact, conclusions of law, judgment, and decrees of the water court. Section 37–92–304(10), C.R.S. (2012), grants the water court discretion within a three-year period to correct substantive errors in a water decree. The parties' stipulations anticipated that actual monthly historical consumptive use numbers would be utilized in the decrees' monthly limitations. The original decrees mistakenly did not contain these numbers, contrary to the intent of the parties. The water court did not abuse its discretion in entering the corrected decrees. Accordingly, we affirm the water court's judgment.

### A.

### Standard of Review

¶ 25 Statutory interpretation is a question of law we review de novo. *MDC Holdings, Inc. v. Town of Parker*, 223 P.3d 710, 717 (Colo.2010). We review for abuse of discretion the water court's order granting Minturn's petitions to correct substantive errors in the original decrees pursuant to section 37–92–304(10). *See, e.g., Farmer's Reservoir & Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 806 (Colo.2001). We review the water court's decision to admit or deny evidence for abuse of discretion. *City of Englewood v. Burlington Ditch, Reservoir & Land Co.*, 235 P.3d 1061, 1066 (Colo.2010). Factual findings are binding on appeal unless they are so clearly erroneous as to find no support in the record. *Id.* at 1066. The sufficiency, probative effect, weight of the evidence, and the inferences drawn there-

from are for the water court to determine; we will not disturb them on appeal. *Archuleta v. Gomez*, 2012 CO 71, ¶ 7, 290 P.3d 482; *Gibbs v. Wolf Land Co.*, 856 P.2d 798, 801 (Colo.1993).

¶ 26 Water courts may adopt and incorporate a proposed stipulation into a decree. *Colo. River Water Conservation Dist. v. Bar Forty Seven Co.*, 195 Colo. 478, 481, 579 P.2d 636, 638 (1978). Courts construe a stipulated decree as they would a contract. *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 146 (Colo.2006) [*Cherokee I*]; *City of Golden v. Simpson*, 83 P.3d 87, 93 (Colo. 2004). We review the water court's contract interpretation de novo. *City of Golden*, 83 P.3d at 94. Consistent with ordinary contract principles, our primary goal when construing a stipulation is to give effect to the intention of the parties. *Cherokee Metro. Dist. v. Upper Black Squirrel Creek Designated Ground Water Mgmt. Dist.*, 247 P.3d 567, 573 (Colo.2011) [*Cherokee II*].

### B.

### The Water Court's Discretion Under Section 37–92–304(10) to Correct Substantive Errors in the Original Decrees

¶ 27 Minturn asserts that section 37–92–304(10) provided the proper avenue for Minturn to seek correction of the water court decrees at issue in this appeal. We agree. In matters of statutory interpretation, the reviewing court has a responsibility to interpret statutes so as to give effect to the General Assembly's intent in enacting the statute. *Carlson v. Ferris*, 85 P.3d 504, 508 (Colo.2003). Thus, words and phrases utilized in a statute should be given effect according to their plain and ordinary meaning because we presume the General Assembly meant what it said. *City of Westminster v. Dogan Const. Co., Inc.*, 930 P.2d 585, 593–94 (Colo.1997).

¶ 28 Section 37–92–304(10) provides for the correction of substantive errors as well as clerical errors:

Clerical mistakes in said judgment and decree may be corrected by the water judge on his own initiative or on the petition of any person, and *substantive errors*

*therein may be corrected by the water judge on the petition of any person whose rights have been adversely affected thereby and a showing satisfactory to the water judge that such person, due to mistake, inadvertence, or excusable neglect,* failed to file a protest with the water clerk within the time specified in this section. *Any petition referred to in the preceding sentence shall be filed with the water clerk within three years after the date of the entry of said judgment and decree.* The water judge may order such notice of any such correction proceedings as he determines to be appropriate. Any order of the water judge making such corrections shall be subject to appellate review as in other civil actions.

(Emphasis added).

¶ 29 This language plainly grants the water court discretion to correct substantive errors that adversely affect a water right so long as the petitioner meets the conditions set forth in the statute. Here, Minturn alleged the existence of substantive errors [8] in the decrees that would adversely affect its water rights, specifically described the mistakes and proposed corrections, explained that the mistakes resulted from billing data the Eagle River Water and Sanitation District provided to Minturn instead of the actual consumptive use data attributable to the exercise of Minturn's water rights, and described the adverse prejudicial effect these errors would have on the town's rights due to inconsistencies between the limitations set forth in the original decrees and Minturn's monthly usage of the water. Minturn filed its petitions to correct the decrees within three years of the water court's entry of the initial decrees. Thus, Minturn established a prima facie showing of substantive error under the criteria set forth in section 37–92–304(10).

¶ 30 In *Meyring Livestock Co. v. Wamsley Cattle Co.*, 687 P.2d 955 (Colo.1984), we held that once a party establishes a prima facie showing of clerical error, it becomes the duty of the trial court to admit and consider all pertinent testimony offered to establish the intent of the original decree. 687 P.2d at 959. "When examining a decree for clerical error, evidence outside the record of the decree may and should be considered." *Id.* Similarly, upon a prima facie showing of substantive error, and where the motion to correct the decree is opposed, the trial court must conduct further proceedings in order to ascertain whether the decree contained the alleged errors and correction of those alleged errors is appropriate. Section 37–92–304(10) does not prescribe a specific form that these further proceedings should take; rather, it provides that "[t]he water judge may order such notice of any such correction proceedings as he determines to be appropriate."

¶ 31 In this case, the water court had, among other things, the following materials upon which to rely in making its determination: the stipulations and initial decrees, the parties' briefs and affidavits, and the acquiescence of every remaining Opposer to Minturn's requested corrections. Both parties relied on affidavits and neither requested an evidentiary hearing. Under these circumstances, the trial court did not err in basing its decision to enter the corrected decrees on the evidence pertinent to contract construction presented by the parties. *See, e.g., Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1192 (Colo.2005) (finding that in the context of a 12(b)(2) motion prior to trial, a court may in its discretion address the motion based solely on documentary evidence or by holding a hearing).

¶ 32 The water court did not abuse its discretion under section 37–92–304(10) in concluding that the parties to the stipulations and initial decrees intended the monthly maximum limitations and consumptive use factors contained in the decrees to reflect Minturn's actual consumptive use, rather than the billing month data the Eagle River Water and Sanitation District provided that had mistakenly created substantive errors in the initial decrees.

8. In his opening brief, Tucker repeatedly attacks Minturn for alleging a "clerical error" in its petitions to correct the water court decrees. In his reply, however, Tucker appears to concede that Minturn never attempted to characterize the errors as "clerical," but rather sought correction of "substantive errors" in the decrees.

¶ 33 The language of the stipulations and initial decrees supports the water court's entry of the corrected decrees. In Case No. 05CW262, Minturn and Tucker's predecessor BMC submitted the following proposed language to be included in the original decree's "Consumptive Use Factors" section: "[t]he determination of the method of accounting for the consumptive use associated with irrigation herein is *based on the historical actual use of Applicant* that was calculated at a 75% consumptive use factor in light of the nature of the irrigation within Minturn." (Emphasis added). The water court ultimately adopted this language into the decree. Likewise, in Case No. 07CW225, the stipulation between Minturn and Tucker's predecessors Battle Mountain LLC, BMC, and Sensible Housing Company read, "[t]he determination of the method of accounting for the consumptive use limitations under Paragraph 11.B associated with irrigation herein is *based on the retrospective, historical actual use of Applicant* that was calculated at a 75% consumptive use factor in light of the nature of the irrigation within the Town." (Emphasis added). This language was also incorporated into the initial decree issued in that case. At no point did Tucker's predecessors in interest object to inclusion of these provisions.

■ ¶ 34 The quoted language underscores that the parties considered Minturn's "historical actual use" to be operative in calculating consumptive use numbers and factors for the irrigation season. Established practice in water adjudication proceedings makes historical use a significant or controlling factor in the determination of parties' water rights. *See, e.g., Burlington Ditch Reservoir and Land Co. v. Metro Wastewater Reclamation Dist.,* 256 P.3d 645, 661 (Colo.2011) ("Colorado law requiring the quantification of historical consumptive use in change proceedings guards against speculation and waste, ensuring optimum use and reliability in the prior appropriation system."); *In re Water Rights of Cent. CO Water Conservancy Dist.,* 147 P.3d 9, 14 (Colo.2006) ("[T]he right to change a ... type, place or time of use, is limited by the appropriation's historic use." (internal quotation omitted)); *Farmer's Reservoir & Irriga-*

*tion Co.,* 33 P.3d at 814 ("The fundamental object of a change proceeding is to secure to owners their allocated share of historic beneficial consumptive use ... while protecting against injury to other water rights when the change of water right or plan operates in the surface and tributary groundwater stream system."); *Concerning Application for Water Rights of Midway Ranches Prop. Owners' Ass'n, Inc. in El Paso & Pueblo Cntys.,* 938 P.2d 515, 522 (Colo.1997) ("[T]he measure of a water right is the amount of water historically withdrawn and consumed over time in the course of applying water to beneficial use under the tributary appropriation without diminishment of return flows.").

■ ¶ 35 In his affidavits on behalf of Minturn, Wood attested to the existence of substantive errors in the original decrees, explained how these errors had mistakenly occurred, and stated his opinion as to what corrected monthly maximum values would correlate to Minturn's actual historical usage. In Case No. 07CW225, Minturn filed its first Reply in Support of Petition to Correct Substantive Errors, attaching Wood's first affidavit, on April 8, 2011. Tucker filed a supplemental response on April 18, 2011, to which he attached his own affidavit. In his response, Tucker did not object to admittance of Wood's affidavit into the record, nor did he move to strike the affidavit. Further, he made no attempt to proffer a professional opinion countering Wood's opinion, instead simply reciting his personal opinion that the proposed corrections were less restrictive on Minturn. The water court considered Tucker's supplemental response and affidavit, but afforded weight to Wood's opinion rather than Tucker's. Thus, Tucker had notice of the issues in the case and fair opportunity to address these issues. A trial court abuses its discretion only if the trial court's ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Ibarra,* 849 P.2d 33, 38 (Colo.1993). Given that Tucker was afforded the opportunity to respond to Minturn's claims and Wood's expert opinion, but did not counter that expert opinion with other expert opinion, we cannot say that the court abused its discretion in accepting Wood's expert opinion as a basis for correcting the original decrees.

¶ 36 Despite his various objections to the corrected decrees, Tucker does not contest Minturn's assertion that the monthly maximum limitations and consumptive use factors set forth in the original decrees reflected Minturn's use by billing month, rather than by month of actual use. In upholding the water court's entry of the corrected decrees, we conclude that the parties to the stipulations, Minturn and Tucker's predecessors, anticipated and intended that the monthly maximum limitations to be included in the decrees would incorporate Minturn's actual historical consumptive use numbers and factors. Minturn's water rights were prejudiced by the mistake contained in the original decrees, a mistake rectified by including the actual monthly consumptive use numbers and factors in the corrected decrees.

¶ 37 In sum, Minturn met the criteria established in section 37–92–304(10) and could properly petition the water court to correct the decrees' substantive errors. As discussed more fully below, the water court likewise acted within its statutory authority and did not abuse its discretion in granting Minturn's petitions and entering the corrected decrees in order to effectuate the intent of the parties' stipulations.

## C.

### The Stipulations' "No Less Restrictive" Provisions

¶ 38 Tucker asserts that, notwithstanding the water court's authority to correct substantive errors in a decree, the water court was precluded from doing so in this instance by the stipulations entered into between Minturn and Tucker's predecessors in interest, which provided that the parties would not object to entry of decrees containing terms and conditions "no less restrictive" than those set forth in the stipulations.

¶ 39 As a threshold matter, the "no less restrictive" provisions did not—and could not—curtail the water court's authority to enter decrees with terms and conditions differing from those contained in the stipulations; it only limited the parties' ability to object to entry of less restrictive decrees. *See Metro Wastewater Reclamation Dist.*,

256 P.3d at 677 (concluding that because administration of water rights in the state of Colorado is by decree, not stipulation, water courts may refuse to incorporate the terms of a party's stipulation into final decrees so long as they provide adequate reasoning for doing so). Accordingly, our duty on review is to determine whether the water court (1) properly implemented the meaning of the "no less restrictive" provisions of the stipulations as applied to the monthly maximum limitations and consumptive use factors set forth in the decrees, and (2) based its entry of the corrected decrees on sufficient evidence of the parties' intent in the record.

### 1. Construction of the Stipulations

¶ 40 We construe stipulations according to ordinary contract principles and with the goal of effectuating the parties' intent as expressed in the instrument itself. *Cherokee II*, 247 P.3d at 573. To determine intent, we turn first to the plain and generally accepted meaning of the words in the instrument. *Id.* Where the language of a stipulation is susceptible to more than one reasonable interpretation, and is therefore ambiguous, the facts and circumstances of its execution may be considered in determining the particular interpretation actually intended by the parties. *In re Revised Abandonment List of Water Rights in Water Div. 2*, 2012 CO 35, ¶ 14, 276 P.3d 571; *Cherokee I*, 148 P.3d at 146; *Lane v. Urgitus*, 145 P.3d 672, 679 (Colo.2006). To determine whether there is ambiguity, courts must examine the instrument's language and construe it in harmony with the plain and generally accepted meaning of the words employed. *Cherokee II*, 247 P.3d at 573. Disagreement regarding the correct interpretation of the instrument does not itself create an ambiguity. *Id.*

¶ 41 In addition to these general principles of contract law, more specific principles apply to stipulations. A party may stipulate away valuable rights provided the stipulation does not violate public policy. *USI Properties E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo.1997). Water courts must give effect to the parties' stipulations, absent good reason to the contrary, by entering them into court decrees. *Cherokee II*, 247 P.3d at 573

(Colo.2011). A party's participation in a stipulation incorporated into a decree precludes that party from advancing legal contentions contrary to the plain and unambiguous terms contained therein. *Id.*

¶ 42 In this case, the parties offer significantly different constructions of the phrase "no less restrictive" as applied to the monthly maximum limitations and consumptive use factors set forth in the parties' stipulations. The stipulations between Minturn and Tucker's predecessors in interest provided,

> Opposers will not oppose the entry of a ruling and decree in this matter provided that said ruling and decree contains terms and conditions that are *no less restrictive* than those set forth in the decree attached hereto as Exhibit A.

(Emphasis added).

¶ 43 Tucker contends that under the plain language of the stipulations, any increase in the monthly maximum limitations is per se less restrictive on Minturn. He asserts that his predecessors set bargained-for monthly maximum values and that Minturn must be held to the plain and unambiguous terms of its bargain.

¶ 44 In contrast, Minturn argues that the "no less restrictive" qualifier applies to the monthly maximums on an annual or irrigation-season basis. It argues that, despite increases in the monthly maximums in June and July, the corrected decrees are no less restrictive because they do not increase Minturn's allotted consumptive use over the course of a full year or complete irrigation season. It further asserts that the water court adopted this reasoning in granting Minturn's petitions.

¶ 45 Because our review of the parties' stipulations is de novo and we ultimately reach the same conclusion as the water court, we affirm its judgment. Construction of the phrase "no less restrictive" as applied to the monthly maximums and consumptive use factors requires us to look first to the plain language of the stipulations. *Cherokee II*, 247 P.3d at 573. In this case, the stipulations themselves shed little light on the meaning intended by the parties. The "no less restrictive" provisions are located in the beginning of the parties' stipulations and apply to the "terms and conditions" of the complete proposed decrees attached to the stipulations. Consequently, "no less restrictive" could have one meaning as applied to a particular term or condition of the proposed decrees, and a different meaning as applied to another. With regard to the monthly maximum limitations in particular, "no less restrictive" could, as Tucker asserts, mean that any increase in Minturn's consumptive use limitations by means of a corrected decree is per se less restrictive. In the alternative, the parties could have intended "no less restrictive" to be interpreted in the context of stream conditions, amount of available water, and potential impact on other water rights holders. Because the phrase is open to more than one reasonable interpretation, it is ambiguous. Accordingly, we may consider the facts and circumstances surrounding the stipulations' execution in order to determine the particular interpretation of this provision actually intended by the parties as applied to the corrections at issue. *See In re Revised Abandonment List of Water Rights in Water Div. 2*, 276 P.3d at 575.

¶ 46 Tucker's approach would prevent the operation of section 37–92–304(10) to correct substantive errors, in this case rendering even the most marginal increase to a single monthly maximum "less restrictive" on Minturn. There is no evidence that the parties intended this result. Nevertheless, in rejecting Tucker's argument, we do not endorse Minturn's position that the water court found the "no less restrictive" qualifier to apply to the monthly maximums on an annual or irrigation-season—rather than monthly—basis. Several of the corrections were made to the specific monthly maximum numbers listed in the parties' stipulations in order to accurately reflect the intent of the parties. It is common practice for water courts to specify monthly consumptive use figures in water decrees. *See, e.g., Pagosa Area Water & Sanitation Dist. v. Trout Unlimited*, 170 P.3d 307, 319 n. 12 (Colo.2007) ("Assessing a reasonable projection of the mixture of uses and their consumptive measures will yield monthly and annual consumptive use figures for the water applied to beneficial use."). In Case No. 05CW262, the water court's order

granting Minturn's petition states, "the Court having reviewed the Petition and being fully advised in the premises, hereby grants the Petition." In its Corrected Findings of Fact, Conclusions of Law, Judgment and Decree, the court explained,

> Applicant filed a Petition to Correct Substantive Errors in Decree in Case No. 05CW262 on March 15, 2011 ("Petition"), seeking to correct substantive errors in Paragraphs 8 and 11 of the Original Decree. With the exception of [Tucker], all parties consented to the correction of such errors in the Original Decree and entry of these Corrected Findings of Fact, Conclusions of Law, Judgment and Decree. By granting the Petition, the *Water Court finds that the corrections to the Original Decree are no less restrictive on Applicant than the limitations contained in the Original Decree* and are therefore consistent with the stipulation entered into between Applicant and Battle Mountain Corporation, a Florida Corporation, for whom [Tucker] was substituted.

(Emphasis added).

¶ 47 Similarly, in Case No. 07CW225, the court's Amended Order Granting Petition to Correct Substantive Errors in Decree reads:

> [Tucker] also seeks denial of the Petition, arguing that through the Petition Minturn seeks to unilaterally modify the stipulation and that the [Tucker] was not a party to the stipulation. *This Court concludes that Minturn does not seek to modify the stipulation; it has requested corrections to the decree, consistent with the express terms and conditions of the stipulation.*

(Emphasis added).

¶ 48 By its entry of the corrected decrees, the water court concluded that the stipulations provided for the use of actual historical monthly consumptive use numbers and the corrected numbers were no less restrictive on Minturn than intended by the parties.

¶ 49 The water court did not err. As discussed in the above section, the parties to the original stipulations intended the monthly maximum limitations and consumptive use factors to reflect Minturn's actual historical use. Evidence of this intent lies in the "his-torical actual use" language in the stipulations and original decrees, to which no party objected, the affidavits submitted by the parties, the acquiescence of every other Opposer to Minturn's proposed corrections, and the common practice and policy underlying water rights adjudications. Given the parties' reasonable expectation and intention that the monthly maximums and consumptive use factors would incorporate Minturn's actual use, the "no less restrictive" language was intended to anchor these maximum monthly values to Minturn's actual historical usage.

¶ 50 This construction also effectuates the parties' intent to prevent injury to other water rights. One of the essential functions of water rights proceedings is to prevent injury to other water rights in operation of the judgment and decree. *Farmer's Reservoir & Irrigation Co.*, 33 P.3d at 807. "Central to the water court's review of an augmentation plan is the express requirement that augmentation plans must be non-injurious to vested water rights and that they only be approved upon terms and conditions that prevent injury to those rights." *Upper Eagle Reg'l Water Auth. v. Wolfe*, 230 P.3d 1203, 1210 (Colo.2010). "A classic form of injury involves diminution of the available water supply that a water rights holder would otherwise enjoy at the time and place and in the amount of demand for beneficial use under the holder's decreed water right operating in priority." *Farmer's Reservoir & Irrigation Co.*, 33 P.3d at 807. Thus, the parties intended the "no less restrictive" provision to prevent injury to other water rights should the water court enter a decree differing from the parties' stipulations. This provision effectively preserved Tucker's right to object to implementation of monthly maximums and consumptive use factors that could have an injurious effect on any water rights he held.

¶ 51 Having determined the parties' intended construction of "no less restrictive" as applied to the specific monthly maximums and consumptive use factors in this case, we now review the water court's factual findings that the corrected decrees were no less restrictive on Minturn than intended by the parties' stipulations.

## 2. The Water Court's Factual Determination that Corrected Decrees were "No Less Restrictive" on Minturn

¶ 52 As discussed above, the water court had sufficient reliable evidence in the form of the stipulations and decrees, submissions by the parties, and affidavits, to enter corrected limitations that would correlate to Minturn's actual historical beneficial consumptive use.

¶ 53 We further conclude that the water court based its finding that the corrected limitations and consumptive use factors would not injuriously affect other water rights on sufficient evidence and did not clearly err in reaching its conclusion. In its corrected decrees, the water court concluded that Minturn's changes of water rights would "not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right." (Case No. 05CW262); *see also* Case No. 07CW225 ("If operated in accordance with the terms and conditions of this decree, the plan for augmentation, including Augmentation Exchanges, Eagle River Contract Exchanges and Colorado River Contract Exchanges, described herein will prevent injury to senior vested or decreed conditional water rights."). Again, the record supports the water court's entry of the corrected decrees.

¶ 54 Of crucial importance, Tucker failed to demonstrate how any water rights he holds would be injured in any way by the corrected decrees. Rather than explaining how his water rights would actually be impaired, Tucker complains that the corrected decrees deprive him of the "benefit of his bargain" reached after substantial effort and negotiation. However, the water court correctly determined that Tucker's predecessors, like Minturn, intended to have the monthly consumptive use numbers reflect actual monthly usage, not billing statements that run a month behind the actual usage.

¶ 55 Notwithstanding, the corrected decrees provide Tucker with a remedy should he demonstrate injury to water rights he holds. Pursuant to section 37–92–304(6), C.R.S. (2012), both decrees contain a provision for water court retained jurisdiction over the adjudication for a period of five years, commencing on the date of the decrees, on the question of injury to the vested water rights of others. The decrees further provide for a ten-year period of retained jurisdiction for Minturn and the State Engineer to reevaluate and account for the actual consumptive use for irrigation:

> With regard to the determination of consumptive use for irrigation within the place of use described in Paragraph 14 above or any consumptive use of Minturn's system losses described in Paragraph 11 above, the retained period shall be ten years in order for the Applicant and State and Division Engineers to re-evaluate whether the consumptive use determinations in Paragraph 11 continues to reflect and account for the actual consumptive use for irrigation.

¶ 56 Our case law establishes that a petitioner seeking to have the water court reopen a change of water rights or augmentation plan decree must plead sufficient facts which, if proved, meet its burden of showing that injury has occurred or is likely to occur, based on operational experience involving the change of water right or out-of-priority diversions and depletions covered by the augmentation plan. *Upper Eagle Reg'l Water Auth.*, 230 P.3d at 1216. If the petition alleges such facts, the water court should conduct additional proceedings. *Id.* The petitioner then has the burden of presenting sufficient evidence that injury has occurred or is likely to occur because the existing decree is inadequate to preclude or remedy injury. *Id.* at 1216–17.

¶ 57 Accordingly, despite Tucker's failure to demonstrate injury to his water rights during the corrected decree proceedings, the retained jurisdiction provides an avenue for relief should he show injury to water rights he holds.

¶ 58 In sum, we conclude that the water court did not err in its conclusions of law; its factual determination that the corrections are no less restrictive on Minturn is supported by the evidence; and it did not abuse its discretion in conforming the decrees to the intent of the parties pursuant to its authority

under section 37–92–304(10).[9]

## III.

¶ 59 Accordingly, we uphold the water court's entry of the corrected decrees and affirm its judgment.

Justice COATS dissents, and Justice EID joins in the dissent.

Justice COATS, dissenting.

¶ 60 Because I believe the majority rationale is untenable simply as a matter of contract construction, without regard for the proper interpretation of section 37–92–304(10), I respectfully dissent.

¶ 61 Although the water court offered virtually no explanation for its order granting Minturn's petition for correction, Minturn itself has argued that rather than specific amounts, the stipulation contemplated merely a decree no less restrictive than its proposal; that by "no less restrictive" the stipulation referred only to its specified annual limitation and not the specific monthly limitations included therein; and that Minturn's own acceptance of erroneous monthly figures from the Eagle River Water and Sanitation District, the figures that were agreed to by the parties and included in the written stipulation, resulted in "substantive errors" in the decree that were correctable within the contemplation of section 37–92–304(10) of the revised statutes. While I would reject even this argument, the majority merely declines to endorse it or rely on similar reasoning. Instead, the majority finds the stipulation to be ambiguous; concludes from extrinsic evidence that the parties intended to stipulate to Minturn's actual monthly historic consumption, whatever the court might determine those amounts to be, rather than the amounts specified in the written stipulation; and finds it to have been within the discretion of the water court to accept the post-decree affidavit submitted by Minturn as the more accurate accounting and correct the monthly figures in the decree taken from the written stipulation.

¶ 62 Initially, I disagree that the phrase "no less restrictive" in the stipulation is ambiguous. In the absence of context suggesting otherwise, these words apply, on their face, to all of the restrictive conditions of the stipulation, especially those expressly designated as, "Monthly Maximum Limitations." Even if, however, the phrase could be considered ambiguous with regard to the precise terms and conditions of the stipulation to which it was intended to apply, that fact could nevertheless in no way support the majority's reliance on extrinsic evidence to interpret the stipulation as intending to prescribe only a methodology for calculating Minturn's entitlement rather than intending a limitation to specific amounts. To the extent the majority rationale can be read to imply that any ambiguity in a contract permits a resort to extrinsic evidence to determine its meaning, including even the meaning of matters that appear unambiguously in the language chosen by the parties, I strongly disagree.

¶ 63 In any event, unlike the majority I do not believe that the general methodological language included in the court's decree, indicating that the consumptive use limitations of the stipulation were "based on" the historical actual use of Minturn, maj. op. ¶ 33, can contradict or displace the specific amounts arrived at by this methodology and included as the stipulation of the parties. Nothing in this methodological statement remotely suggests that it was the intent of the parties to agree that Minturn would be entitled to whatever monthly amounts the water court should determine to be its actual historic consumption, and the inclusion of specific monthly limitations is clearly antithetical to any such intent. By adding a provision spec-

9. Tucker also asserts that the water court erred in denying him a "reasonable continuance to take discovery after Applicant set forth a new argument attaching new exhibits and a new affidavit to its reply, which were not propounded in Applicant's initial 'clerical error' petition to the court." He advises the court, however, that this argument "is an alternative or supplemental argument which this Court need not consider if the Court does not reverse the Water Court.... [T]his Court should consider this argument if ... the case is remanded for further proceedings in the Water Court." Because we uphold the water court's orders, we need not address Tucker's arguments concerning the court's denial of his request for extended briefing.

ifying that the Opposers would accede to any decree with terms and conditions no less restrictive that those to which they had stipulated, the parties indicated even more emphatically the significance of the specific terms and conditions of the stipulation.

¶ 64 Whether or not section 37–92–304(10) of the revised statutes could be interpreted to treat substantive errors by the parties to a stipulation as the substantive errors of a decree faithfully embodying that stipulation, it would therefore not justify the correction of Minturn's error in this case. Because I do not believe the water court's amended decree to be supported by the theory advanced by either Minturn or the majority, I respectfully dissent.

I am authorized to state that Justice EID joins in this dissent.