2015 CO 51

**ST. JUDE'S CO. and Reno Cerise, Plaintiffs–Appellants**

v.

**ROARING FORK CLUB, L.L.C.; Basalt Water Conservancy District; and Colorado Water Conservation Board; Defendants–Appellees**

and

**Alan Martellaro, Division Engineer, Water Division 5., Appellee Pursuant to C.A.R. 1(e).**

**Supreme Court Case No. 13SA132**

Supreme Court of Colorado.

June 29, 2015

444

Attorneys for Plaintiffs–Appellants: Law Offices of Gregory J. Cucarola, Gregory J. Cucarola, Sterling, CO, Hill & Robbins, P.C., David W. Robbins, Andrew J. Rottman, Denver, CO, Roger T. Williams, Golden, CO

Attorneys for Defendant–Appellee Roaring Fork Club, L.L.C.: Patrick, Miller & Noto, P.C., Scott C. Miller, Jason M. Groves, Aspen, CO, Pryor, Johnson, Carney, Karr, Nixon, P.C., Bradley N. Shefrin, Marta M. Jucha, Greenwood Village, CO

Attorneys for Amicus Curiae Pitkin County Board of County Commissioners: Moses, Wittemyer, Harrison and Woodruff, P.C., Timothy J. Beaton, Jennifer M. DiLalla, Andrea A. Kehrl, Boulder, CO

Attorneys for Amicus Curiae Colorado Department of Natural Resources: Cynthia H. Coffman, Attorney General, Susan J. Schneider, First Assistant Attorney General, Derek L. Turner, Assistant Attorney General, Denver, CO

Attorneys for Amici Curiae Galloway, Inc. and Thomas Bailey: Porzak Browning & Bushong LLP, Michael F. Browning, Kevin J. Kinnear, Boulder, CO

Attorneys for Amici Curiae Jackson–Shaw / Taylor River Ranch, LLC, a Colorado limited liability company, and Crystal Creek Homeowners Association, Inc., a Colorado non-profit corporation: Law of the Rockies, Marcus J. Lock, Kendall Burgemeister, Gunnison, CO

Attorneys for Amici Curiae Charles E. Nearburg and Catamount Development, Inc.: Petros & White LLC, David Hayes, Denver, CO

Attorneys for Amicus Curiae The Flyfisher Group, LLC: Fairfield & Woods, P.C., Marjorie Sant, Denver, CO

Attorneys for Amicus Curiae Ranch at Roaring Fork Homeowners Association, Inc.: Karp Neu Hanlon, P.C., Jeffrey J. Conklin, Michael J. Sawyer, Glenwood Springs, CO

Attorneys for Amicus Curiae Colorado River Water Conservation District: Peter C. Fleming, Jason V. Turner, Glenwood Springs, CO

No appearance by or on behalf of Basalt Water Conservancy District, Colorado Water Conservation Board, and Alan Martellaro, Division Engineer, Water Division 5.

Justice COATS delivered the Opinion of the Court.

¶ 1 St. Jude's Co. appealed directly to this court from a consolidated judgment of the water court in favor of Roaring Fork Club. With regard to the Club's two applications for water rights, the water court granted appropriative rights, approved the Club's accompanying augmentation plan, and amended the legal description of the Club's point of diversion for an already decreed right. With regard to the separate action filed by St. Jude's Co., the water court denied all but one of its claims for trespass, denied its claims for breach of a prior settlement agreement with the Club, denied its claims for declaratory and injunctive relief concerning its asserted entitlement to the exercise of powers of eminent domain, quieted title to disputed rights implicated in the Club's application for an augmentation plan, and awarded attorney fees in favor of the Club, according to the terms of the settlement agreement of the parties.

¶ 2 Because the Club failed to demonstrate an intent to apply the amount of water for which it sought a decree to any beneficial use, as contemplated by either the constitution or statutes of the jurisdiction, the water court's order decreeing appropriative rights is reversed. Because the water court did not, however, misinterpret the various agreements at issue or other governing law, make any clearly erroneous factual findings, or abuse its discretion concerning discovery matters or the award of attorney fees, the remaining rulings of the water court to which error has been assigned by St. Jude's Co. are affirmed. The Club's request for appellate attorney fees expended defending those fees already granted according to the provisions of the settlement agreement is also granted, and the matter is remanded to the water court for a determination of the amount of those fees.

## I.

¶ 3 In March 2007, Roaring Fork Club, L.L.C., the owner of a private golf, fishing, recreational, and residential resort located near the town of Basalt, filed two water applications with the water court for Colorado Water Division 5. In its first application, the Club sought a decree for new appropriative rights and a change in the point of diversion for an existing right. With regard to the former, the Club's application asserted that the Club had, since 2001, diverted 21 cubic feet per second ("cfs") from the Roaring Fork River, into the RFC Ditch. The application indicated that the RFC Ditch is a flow-through structure located entirely on Club land, which returns water to the Roaring Fork River approximately one half-mile downstream from its point of diversion, and that the Club used the water in question and the RFC Ditch itself as an "aesthetic and recreational amenity to a golf course development, as well as for fish habitat and as a private fly-fishing stream." The Club sought a decree for the amount in question for "aesthetic, recreation, and piscatorial uses." With regard to its application for change of water right, the Club explained that it sought to align the legal description of its point of diversion with the actual location of its structure, for one of its existing water rights in the RFC Ditch, decreed in 1999 in Case No. 95CW356, for 10 cfs conditional, with an appropriation date of December 12, 1995.

¶ 4 On the same day, the Club filed a second application with the water court, seeking approval of an augmentation plan for the RFC Ditch. This application explained that the Club diverted up to 40 cfs in total through the wider-than-normal RFC Ditch, entailing evaporative losses from its surface area. The application proposed to augment the evaporative depletions associated with all of the Club's water rights through the RFC Ditch using a combination of previous decrees for water rights and consumptive use credits.

¶ 5 St. Jude's Co., an agricultural business, and Reno Cerise, one of two partners of St. Jude's Co., filed joint statements of opposition in both cases.[1] St. Jude's Co. alleged that it retained water rights in the Roaring Fork River, that it currently diverted at the RFC Headgate and through the RFC Ditch, and that its rights would be adversely affected if the Club's applications were granted without the sufficient terms, conditions, and limitations. St. Jude's Co. therefore requested that the court place the Club on strict proof in its applications.

¶ 6 The following fall, in October 2007, St. Jude's Co. and Cerise filed a complaint with the water court naming the Club as defendant. In the complaint, St. Jude's Co. alleged that while it currently diverted at the RFC Headgate and through the RFC Ditch, it did so on a "temporary basis," that these rights were actually decreed for a different headgate—the John Cerise Headgate—also on Club property, and that St. Jude's Co. had suffered curtailment of its rights because the Club refused the Company access to, and use of, the John Cerise Headgate. St. Jude's Co. further alleged that this denial violated its rights under both Colorado law and a settlement agreement between the parties governing their shared use of the RFC Ditch. The complaint made a number of claims against the Club based on these allegations, including, as relevant here, trespass on the Company's water rights and easements; a claim for declaratory judgment regarding the rights of St. Jude's Co. vis-á-vis the Club, the RFC Ditch, and the Company's ditch water rights, including a declaration of the Company's right to exercise the power of eminent domain to condemn an easement for an underground pipeline through Club land, in lieu of reliance on the RFC Ditch; breach of the settlement agreement between the parties; and, ultimately, a request to quiet title to Priority 280 (one of the sources of water proposed for the Club's augmentation plan) in St. Jude's Co., to the exclusion of the Club.[2] As remedies, St. Jude's Co. requested

---

1. The water court found that St. Jude's Co. (not Cerise) owned the water rights at issue, owned the relevant land, and was the party to the relevant agreements; it found Cerise to be without independent legal interest in the matter at hand.

For simplicity, this opinion will generally refer only to "St. Jude's Co."

2. In its proposed augmentation plan filed in March 2007, the Club listed Priority 280 as a

declaratory and injunctive relief, as well as monetary damages.

¶ 7 Upon motion by St. Jude's Co., the water court consolidated its lawsuit with the Club's pending water applications. After extensive proceedings, including an eight-day trial and a site visit, the water court issued a consolidated judgment for the three cases, consisting of its findings of fact and conclusions of law. The court found that St. Jude's Co. and the Club owned contiguous properties next to the Roaring Fork River, where the Club owned the upstream parcel, upon which it operated a golf club, residential accommodations, and related recreational opportunities, and that St. Jude's Co. owned the downstream parcel, where it conducted agricultural operations. The court further found that the dispute between St. Jude's Co. and the Club was shaped by prior litigation, addressed in *Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229 (Colo.2001), in which this court determined that the Club had committed trespass by unilaterally altering irrigation ditches on Club property used by St. Jude's Co., including by replacing the John Cerise Ditch with the RFC Ditch. The water court noted that the prior litigation had ultimately been resolved by settlement, embodied in two documents: the Settlement Agreement and Mutual Release ("Release Agreement") and the Ditch Easement, Access, Maintenance, Repair Operation and Settlement Agreement ("Ditch Agreement"), the latter governing the shared use of the RFC Ditch by both St. Jude's Co. and the Club. The court observed that as a result of the Ditch and Release Agreements, Company water decreed to the John Cerise Ditch was diverted at the RFC Headgate and traveled through the RFC Ditch until a lateral headgate, where it was pulled from the RFC Ditch and channeled to Company land.

¶ 8 With regard to the Club's applications, the water court found that the Club had applied its proposed water right in the full amount of 21 cfs to beneficial use, beginning June 15, 1999. In particular, the court found that Club guests and members used the RFC Ditch for fishing, that the Club stocked the Ditch with fish, and that higher flows made fishing more challenging. In addition, the court found that the RFC Ditch was used as an amenity and feature of the Club's golf course, that all guests and members enjoyed the Ditch as a visual aesthetic amenity, and that higher volumes triggered a better visual quality to the RFC Ditch in support of its aesthetic purpose. As a result, the water court decreed the Club appropriative rights for aesthetic, recreation, and piscatorial uses to 21 cfs absolute with an appropriation date of June 15, 1999. The court also corrected the legal description of the Club's point of diversion and approved the Club's augmentation plan.

¶ 9 With regard to the Company's claims, apart from ordering the Club to remove vegetation from one particular location along the bank of the RFC Ditch, the court denied the claim for trespass. Similarly, it denied the various breach of contract claims and claims for declaratory judgment, including the private right asserted by St. Jude's Co. to exercise the power of eminent domain. With regard to Priority 280, the court found that the title dispute of the parties implicated rights described in both Priority 280 and Priority 364, a water right adjudicated in the same decree as Priority 280. The court apportioned the rights in Priorities 280 and 364 between the parties according to an irrigation ratio reflected in court proceedings preceding the 1936 decree of these rights and in subsequent documentary evidence. Finally, the water court awarded attorney fees to the Club pursuant to the provisions of the Release Agreement.

¶ 10 St. Jude's Co. appealed, seeking review of all the above rulings, as well as the water court's refusal to accept certain late disclosures filed by St. Jude's Co. before trial. After briefing and oral argument, we ordered supplemental briefing on the question whether Roaring Fork's claim for a diversion into and through a ditch for piscatorial and aesthetic purposes, without

previous decree for water right to be used for augmentation. St. Jude's Co. made no claim to Priority 280 in its statement of opposition filed in

May 2007. Notwithstanding its prior silence, St. Jude's Co. later amended its initial complaint in order to add its quiet title claim.

impoundment, is a beneficial use under Colorado water law.

## II.

¶ 11 The Colorado Constitution provides, "The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided." Colo. Const. art. XVI, § 5. It further provides that "[t]he right to divert the unappropriated waters of any natural stream to *beneficial uses* shall never be denied" and that "[p]riority of appropriation shall give the better right as between those using the water for the same purpose." Colo. Const. art. XVI, § 6 (emphasis added).

¶ 12 In this way, the constitution guarantees Colorado's system of prior appropriation as it had developed since territorial days and protects the people of the state from divestment of appropriation. *See Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 34 (Colo.1997). Under this system, "[a] water right comes into existence by applying state water to beneficial use." *Id.* This system differs dramatically from "the common law doctrine giving the riparian owner a right to the flow of water in its natural channel upon and over his lands," which was quickly found to be "inapplicable in Colorado." *Coffin v. Left Hand Ditch Co.*, 6 Colo. 443, 447 (1882). In particular, "the right to the maintenance of the 'flow' of the stream is a riparian right and is completely inconsistent with the doctrine of prior appropriation." *Colo. River Water Conservation Dist. v. Rocky Mountain Power Co.*, 158 Colo. 331, 406 P.2d 798, 800 (1965).

¶ 13 Notwithstanding its guarantee of prior appropriation and protection of adjudicated rights, the constitution makes no attempt to define "use" and "beneficial use" as those terms appear in sections 5 and 6 of article XVI. *City & Cnty. of Denver v. Sheriff*, 105 Colo. 193, 96 P.2d 836, 842 (1939). The constitution's somewhat cursory reference to the right to divert unappropriated waters to beneficial uses offers little insight

as to what such uses may be, for the purposes of the constitution's protection, beyond those uses generally suitable for domestic, agricultural, and manufacturing purposes at the time of the constitution's enactment. *See* Colo. Const. art. XVI, § 6 (stating preference among uses for domestic, agricultural, and manufacturing purposes). While the constitution ratifies Colorado's system of prior appropriation—a system a world apart from Eastern riparian regimes—and protects water rights adjudicated under that system, it leaves to the legislature the details of water rights adjudication under prior appropriation, including any expansion of the concept of beneficial use beyond its strictures at the time of Colorado's birth. *See Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 52 (Colo.1999) (noting that, soon after statehood, the state faced the problems of determination of priorities, distribution of water according to those priorities, and stream measurement, and that the General Assembly adopted the 1879 and 1881 adjudication acts to resolve these problems with a system of judicial adjudication).

¶ 14 Since Colorado's early days, the General Assembly has established the procedures of Colorado's prior appropriation system by enacting water rights adjudication acts. *See id.* (summarizing progression of adjudication acts); *see generally* Gregory J. Hobbs, Jr., *Colorado's 1969 Adjudication and Administration Act: Settling in*, 3 U. Denv. Water L. Rev. 1 (1999) (reviewing the history of water adjudication legislation in Colorado); James N. Corbridge Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law* 139–41 (rev. ed. 1999) (discussing early adjudication statutes). Today, the 1969 Water Right Determination and Administration Act, §§ 37–92–101 to –602, C.R.S. (2014), governs the state's system of prior appropriation and water rights adjudication. *See* § 37–92–102(1)(a) (dedicating "all water in or tributary to natural surface streams" of the state to the public "subject to appropriation and use in accordance with sections 5 and 6 of article XVI of the state constitution and this article"). The 1969 Act defines a "water right" as "a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of

the same," § 37–92–103(12), and defines "appropriation" as "the application of a specified portion of the waters of the state to beneficial use pursuant to the procedures prescribed by law," § 37–92–103(3)(a).

¶ 15 The 1969 Act also includes a definition of "beneficial use," but this provision addresses only what it means for a use to be "beneficial," and then provides three specific examples of applications included within the term "beneficial use." The Act states, " 'Beneficial use' means the use of that amount of water that is *reasonable and appropriate* under *reasonably efficient* practices to accomplish *without waste* the purpose for which the appropriation is lawfully made." § 37–92–103(4) (emphasis added). Notably, this definition echoes the terminological usage of the constitution, by implicitly distinguishing a "purpose," as the end for which the water is used; a "use," as an application of water toward a given purpose and the means to that end; and a "beneficial use," as that use which is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is made. *See id.;* Colo. Const. art. XVI, § 6. Beyond these rudimentary constraints, the 1969 Act's definition of beneficial use is expansive, leaving room for new, innovative uses. *See, e.g., Vance v. Wolfe,* 205 P.3d 1165, 1169 (Colo. 2009) (concluding that, in the terms of the 1969 Act, the coalbed methane process "uses" water to release methane gas—by extracting a particular amount from the ground and storing it in tanks—to "accomplish" a particular mining "purpose"—and that the extraction of water to facilitate coalbed methane production is therefore a "beneficial use").

¶ 16 In three subparts of the 1969 Act's definition of beneficial use, the General Assembly has gone beyond the meaning of "beneficial," providing legislative approval for three specific applications of water, for specified purposes: (1) the impoundment of water for firefighting or storage for any purpose for which an appropriation is lawfully made, including recreational, fishery, or wildlife purposes; (2) the appropriation by the state of Colorado, for the benefit and enjoyment of present and future generations and in the manner prescribed by law, of such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree; and (3) the diversion of water by a county, municipality, city and county, water district, water and sanitation · district, water conservation district, or water conservancy district for recreational in-channel diversion purposes. § 37–92–103(4)(a)–(c).

¶ 17 The latter two beneficial uses, both of which involve the use of water instream, are highly regulated. Instream flows to preserve the natural environment may only be appropriated by the Colorado Water Conservation Board ("CWCB"), a state agency with a "statutory fiduciary duty" to the people of Colorado to both protect the environment and appropriate only the minimum amount of water necessary to do so, § 37–92–102(3); *Aspen Wilderness Workshop, Inc. v. Colo. Water Conservation Bd.,* 901 P.2d 1251, 1257, 1259–60 (Colo.1995) *superseded by statute on other grounds,* ch. 187 sec. 1, § 37–92–102(4)(b)(III), 1996 Colo. Sess. Laws 953–54 *as recognized in Colo. Water Conservation Bd. v. Farmers Water Dev. Co.,* 2015 CO 21, ¶ 28 n.6, 346 P.3d 52, 60 n.6, and these appropriations undergo extensive review by the CWCB, subject to notice and comment, and by an adjudicating water court, *see* § 37–92–102(3)–(4); *see generally Farmers Water Dev. Co.,* ¶¶ 10–13, 346 P.3d at 56–57 (reviewing instream flow appropriation procedures in detail); Colo. Water Conservation Bd., 2 Code Colo. Regs. 408–2 (2009) (Rules Concerning the Colorado Instream Flow and Natural Lake Level Program). Similarly, recreational in-channel diversions ("RICDs"), in-channel stream flows appropriated for nonmotorized boating recreation, § 37–92–103(10.1), (10.3), may only be appropriated by certain governmental entities, § 37–92–103(4)(b), are only permitted for the "minimum amount of stream flow . . . for a reasonable recreation experience," § 37–92–103(10.3), and undergo extensive review by both the CWCB and an adjudicating water court, *see* § 37–92–102(5)–(6); *see generally Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.,* 109 P.3d 585, 592–603 (Colo.2005) (reviewing

RICD appropriation procedures in detail) *superseded by statute in part*, ch. 197, secs. 1–3, §§ 37–92–102(6), –103, –305(13), 2006 Colo. Sess. Laws 906–909; § 37–92–305(13)–(16); Colo. Water Conservation Bd., 2 Code Colo. Regs. 408–3 (2006) (Recreational In–Channel Diversion Rules).

¶ 18 Notably, the General Assembly enacted the RICD provision after *City of Thornton v. City of Fort Collins*, 830 P.2d 915, 931, 933 (Colo.1992), in which this court ruled favorably with respect to a decree by the City of Fort Collins for conditional water rights for recreational, piscatorial, and wildlife uses. In that case, the city used dams to control Poudre River water in its natural channel for development of a fishery, preservation and enhancement of wildlife habitat and aquatic life, and recreational boating. *Id.* at 921, 932. Despite objections that the city sought a "thinly disguised minimum stream flow," *id.* at 921, this court concluded that the city's uses were "recreational, piscatorial and wildlife uses, all valid under the [1969] Act," *id.* at 931, and that "[t]he exclusive authority vested in the CWCB to appropriate minimum stream flows does not detract from the right to divert and to put to beneficial use unappropriated waters by removal or control," *id.* at 930.

¶ 19 After *Fort Collins*, the legislature enacted the RICD provision, expressly recognizing and curtailing appropriations like those in *Fort Collins*. Ch. 305, secs. 1–3, §§ 37–92–102, –103, –305, 2001 Colo. Sess. Laws 1187–89. The RICD legislation "was enacted, at least in part, in response to fears that under *Fort Collins*, appropriators could obtain high recreational in-channel flows, severely hindering Colorado's future water development by either exporting or just tying up large amounts of water." *Upper Gunnison*, 109 P.3d at 599 (internal citation omitted). Since first enactment, the legislature has continued to tighten the controls in the RICD regime. *See* ch. 197, secs. 1–3, §§ 37–92–102, –103, –305, 2006 Colo. Sess. Laws 906–09 (adding (1) provision for public deliberations; (2) definition of "reasonable recreation experience"; (3) presumption that RICDs include water for recreation occurring only between April 1 and Labor Day;

(4) presumptions against injury of RICD rights; and (5) judicial consideration of statutory factors).

¶ 20 The Club's diversion of the water in question for its stated purposes simply fails to meet the statutory requirements for an appropriation—the "application of a specified portion of the waters of the state to beneficial use." § 37–92–103(3)(a). There is not, and clearly could not be, any suggestion that the Club's practice in this regard is one of the three applications specifically authorized as beneficial uses. With regard to the Act's general description of the necessary characteristics of both an appropriation and beneficial use, it is hardly apparent that the Club's usage, as substantiated by the water court, even constitutes a "use" within the contemplation of the statute, much less a beneficial use.

¶ 21 While the 1969 Act does not define the term "use," the act of putting, or applying, a portion of the waters of the state to beneficial use clearly contemplates more than simply diverting it from the natural stream. The "uses" delineated by the Club are entirely passive, *cf. Webster's Third New International Dictionary* 2523 (2002) (defining "use" as "to put into action or service"), amounting to "uses" only in the sense that someone derives enjoyment from the water in its diverted state. Even the most innovative beneficial uses approved under the Act's general definition involve more active use than found here. *See, e.g., Vance*, 205 P.3d at 1169 (emphasizing that coalbed methane process uses a particular quantity of water as is necessary to release methane gas trapped by it).

¶ 22 Whether or not the Club can be said to put the water in question to a "use" within the contemplation of the Act, however, it clearly cannot be said to apply that water to a "beneficial use." The Act's emphasis on reasonableness, efficiency, and avoidance of waste reflects the long-accepted understanding that in order to be beneficial a use must have objective limits, beyond which it becomes unreasonable, inappropriate, inefficient, or wasteful. *See* § 37–92–103(4). This characteristic is typified in the classic beneficial use of irrigation, in which a given irriga-

tion project necessarily implies a duty of water—a total volume of water reasonably needed for a given use, beyond which that use is no longer beneficial. *See Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 272 P.2d 629, 634 (1954); *Vranesh's Colorado Water Law, supra*, at 46. This requirement, embodied in the 1969 Act's use of the term "beneficial," is integral to the very concept of beneficial use, for without it the requirement of reasonableness, efficiency, and non-wastefulness can have no meaning. § 37–92–103(4).

¶ 23 The Club's proposed "uses" of the water in question, as expressed in its application, cannot be beneficial within the meaning of the Act because the only purpose they are offered to serve is the subjective enjoyment of the Club's private guests. The flow of water necessary to *efficiently* produce beauty, excitement, or fun cannot even conceptually be quantified, and therefore where these kinds of subjective experiences are recognized by the legislature to be valuable, it has specifically provided for their public enjoyment, scientific administration, and careful measurement. *See, e.g.*, § 37–92–102 (restricting appropriation of instream flows and in-channel diversions to particular purposes and amounts as determined by a state agency bound by fiduciary duty, and with public participation). Without describing a purpose for the accomplishment of which a measurable amount of water, however approximate, must be used, the Club, by definition, fails to articulate an intent to put the *specific amount* of water it claims to a beneficial use.

¶ 24 In this regard, the Club's asserted "piscatorial" use differs crucially from that in *Faden v. Hubbell*, 93 Colo. 358, 28 P.2d 247, 250–51 (1933), where this court recognized as beneficial the use of water in hatcheries for fish culture. While in *Faden* (and other hatchery applications, *see, e.g., In re Proposed Initiative on "Trespass–Streams with Flowing Water"*, 910 P.2d 21, 27 (Colo.1996) (referencing state hatchery program)), the appropriators used water for fish production, yielding measurable results and thus implying objective limits to reasonable use of water, *see Faden*, 28 P.2d at 248–49; the Club's asserted "piscatorial" use entails the application of water for a more challenging recreational fishing experience or, in other words, subjective enjoyment of its guests.

¶ 25 Recognition of the Club's proposed uses would substantially undermine the intent evident in the legislature's instream flow and RICD provisions. The General Assembly has taken great care to limit recreational and environmental uses of water in-channel, largely to deal with the potential dangers and excesses inherent in capturing the flow of the stream. The Club would indisputably be barred from appropriating rights for its asserted uses were the water in question to remain in the natural course of the Roaring Fork River. *See* §§ 37–92–102(3), –103(4). In effect, the Club seeks to accomplish by virtue of diversion what the legislature has expressly prohibited instream: By using a diversion to effectively change the path of a natural stream or a significant portion of it, the Club seeks approval for re-creating a natural stream on its private property and adjudicating the rights to enjoy the flows therein. This appropriation is tantamount to a "forbidden riparian right." *See Colo. River Water Conservation Dist. v. Colo. River Water Conservation Bd.*, 197 Colo. 469, 594 P.2d 570, 574 (1979). Because an appropriation requires actual application of a portion of the waters of the state to a beneficial use, the Club cannot acquire such a forbidden right simply by virtue of diversion.

¶ 26 For these reasons, the Club's asserted aesthetic, recreation, and piscatorial uses, even when proven as alleged, do not qualify as beneficial uses under the 1969 Act. It is for the General Assembly to approve such unconventional beneficial uses, as it has done with its instream and RICD provisions. *See People v. Emmert*, 198 Colo. 137, 597 P.2d 1025, 1029 (1979) ("If the increasing demand for recreational space on the waters of this state is to be accommodated, the legislative process is the proper method to achieve this end."); *Bd. of Cnty. Comm'rs v. United States*, 891 P.2d 952, 972 (Colo.1995) ("We have consistently recognized that the General Assembly has acted to preserve the natural environment by giving authority to the Colorado Water Conservation Board to appropriate water to maintain the natural environ-

ment, and we will not intrude into an area where legislative prerogative governs.").

¶ 27 The water court's judgment decreeing the Club's new appropriative rights must therefore be reversed, and the decree for aesthetic, recreation, and piscatorial uses vacated. Because the Club's decree for new appropriative rights is vacated, we consider it unnecessary to address the Company's objections to the court's failure to attach additional conditions to its decree.

## III.

¶ 28 St. Jude's Co. also assigns error to a host of rulings, or aspects of rulings, by the water court, ranging from its resolution of disputed issues of fact to its understanding and application of controlling law, including its exercise of discretion concerning discovery and fees matters. We have considered all of these additional assignments of error and find them to be without merit.

## A.

■ ¶ 29 The largest group of these assignments of error involves the interpretation or application of the Ditch Agreement, which settled the issues remaining in the first litigation after this court's remand order in *Roaring Fork Club, L.P.*, 36 P.3d 1229. There appears to be no dispute that such agreements are to be interpreted according to the principles governing the interpretation of contracts, and therefore the Ditch Agreement has meaning according to the intent of the parties as expressed in the instrument itself. *See USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo.1997). As did the water court, we conclude that the various alternate interpretations advocated by St. Jude's Co. are disallowed by the unambiguous terms of the Agreement itself.

■ ¶ 30 With regard to the Company's access to the John Cerise Headgate and the private right of condemnation it claims, the Release Agreement includes an expansive release:

The Parties shall be deemed to have fully, finally, and forever released, acquitted and discharged each other ... from any and all past and present actions, causes of action, suits, claims, liens, demands, sums of money, rights, disputes, expenses, attorney fees, damages, injuries, losses, obligations, and liabilities of any kind or any nature whatsoever, known or unknown, asserted or not asserted, accrued or not accrued, whether arising in tort, contract, by statute, or any other legal theory, arising from the various events and claims that are described in the pleadings filed in the [first] Litigation.

The first litigation concerned the Company's right to convey water across Club land using irrigation structures including the John Cerise Headgate. Concomitantly, the Ditch Agreement expressly grants specific easements for inspection, maintenance, and repair around the RFC Ditch, at its location at the time of signing, as shown by a detailed map attached as an exhibit, and then states that St. Jude's Co. "waive[s] any right to claim any additional or different easement by statute, use, acquiescence, prescription or otherwise." The water court correctly concluded that the language above unambiguously waives both the Company's right to access the John Cerise Headgate and to use the private right of eminent domain to condemn a new easement for underground piping across Club land.

■ ¶ 31 With regard to the contention of St. Jude's Co. that the terms of the Ditch Agreement prohibited the Club from seeking a change in the legal description of its point of diversion without first seeking the agreement of St. Jude's Co., and failing that, consulting a neutral engineer, the Ditch Agreement states, in pertinent part, "Any further improvements, alterations, modifications, and/or realignments of any of the Ditches ... shall require the parties to first attempt to agree upon the actions to be taken." The Agreement further states that, in the event of a disagreement, the parties must consult a neutral third-party hydrology engineer who shall render an opinion as to whether the proposed improvements will have an adverse impact of the delivery of water. These provisions unambiguously contemplate physical alterations of the RFC Ditch. Because it is undisputed that the Club did not seek to physically alter the RFC Ditch by its applica-

tion to change the legal description of its diversion point, the water court correctly concluded that no breach occurred in this respect.

■ ¶ 32 With regard to the Club's diversion of an additional 21 cfs through the RFC Ditch, the language of the Ditch Agreement on which St. Jude's Co. relies as a bar states, "Club shall not be obligated to deliver at its West property boundary ... more than 16 c.f.s. of water from the [RFC] Ditch ... unless [St. Jude's Co.] obtains water court decrees for greater amounts and enlarges the capacity of the Ditches to safely carry such amounts." By its terms, this provision pertains only to the Club's obligation to deliver water to St. Jude's Co. The water court correctly concluded that the language in no way limits the Club's ability to divert additional water through the RFC Ditch.

¶ 33 And with regard to the contention of St. Jude's Co. that the water court erred by finding no breach of the Agreement by the Club's failure to deliver 16 cfs to St. Jude's Co. as required, the Ditch Agreement states that "[s]ubject to the physical availability and administration thereof by the Division Engineer, [St. Jude's Co.] shall be entitled to receive ... all of its historic water flows" from the RFC Ditch, subject to the 16 cfs limit reproduced above, and that St. Jude's Co. "shall give Club reasonable advance notice as to the desired water flows." The water court found, based on ditch logs and witness testimony, that 16 cfs of water was generally available in the RFC Ditch and that St. Jude's Co. simply failed to request the water. On appeal, St. Jude's Co. does not contest these factual findings, but instead, simply reiterates that it received less than its allotted water deliveries under the Ditch Agreement, apparently ignoring the notice requirement. The water court's reading of the Ditch Agreement to require notice as a condition of delivery is accurate, based on the plain language of the Agreement.

■ ¶ 34 Finally, with regard to violation of the Ditch Agreement, St. Jude's Co. assigns error to a number of factual findings by the water court. Such findings are binding on appeal unless they are so clearly erroneous as to find no support in the record.

*Town of Minturn v. Tucker*, 2013 CO 3, ¶ 25, 293 P.3d 581, 590. St. Jude's Co. contends that the water court erred in finding that no locking of the lateral headgate occurred since the signing of the Ditch Agreement. However, the water court relied on uncontested testimony by a Club employee that although a padlock hung from the headgate, it had not been locked since consummation of the Ditch Agreement. In addition, St. Jude's Co. challenges the water court's finding that the Club's alleged flooding of the RFC Ditch, planting of trees, and placement of rocks, decks, and hot tubs did not unreasonably interfere with the Company's non-exclusive easements around the RFC Ditch. The water court's judgment relied on witness testimony from both parties, photographs, and a site inspection. These factual findings were in no sense clearly erroneous.

**B.**

¶ 35 St. Jude's Co. also argues that the water court erred in quieting title to Priorities 280 and 364. In its judgment, the water court found that Priority 280 was decreed for 3 cfs in Case No. 3082 on August 25, 1936, with an appropriation date of March 29, 1885, and that Priority 364 was adjudicated in the same decree for 2.25 cfs with a priority date of September 5, 1905. The court further found that although the decree listed the predecessors of St. Jude's Co. and the Club as claimants, it was silent as to the relative ownership of the predecessors with respect to both quantity and priority. The water court next noted that although the case as pleaded concerned only title to Priority 280 (in dispute because of the Club's attempt to use the right in its augmentation plan), the case as tried concerned title to both Priority 280 and Priority 364 because the priorities arose from the same decree and, in the case at hand, the parties put forth conflicting arguments concerning their relative ownership of both priorities as set forth in the decree. In particular, St. Jude's Co. argued that it owned all of the more senior Priority 280 and a small portion of Priority 364, with the Club taking the remainder of Priority 364, while the Club argued that both parties owned 50% of Priority 280 and Priority 364, respectively.

In light of the scope of the dispute as tried, the water court concluded that it retained jurisdiction to enter a decree addressing both priorities. Relying on extensive documentary evidence and expert opinion, the water court allocated 61% of each right to St. Jude's Co. and 39% of each to the Club.

¶ 36 Judgments based on documentary evidence alone are entitled to no deference by a reviewing court, *Colo. Dep't of Pers. v. Alexander*, 970 P.2d 459, 467 (Colo. 1998); however, where the meaning and weight of the evidence is contested and depends on the credibility of witnesses, an appellate court will not substitute its own findings for that of the trial court, *see M.D.C./ Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382–83 (Colo.1994).

¶ 37 The documentary record supports the following findings. In 1925, the Company's predecessor filed a claim with the State Engineer for the full capacity of the John Cerise Ditch. This claim was not filed in water court or decreed. In 1926, the predecessors of St. Jude's Co. and Club entered into an agreement which allowed the Club's predecessor to use the ditch to make a filing for "an additional three feet of water" from the ditch. In 1936, Priorities 280 and 364 were decreed to the predecessors in a single decree, without indication of their relative ownership. In the proceedings leading to the decree, the predecessors filed a joint ditch claim statement and used a shared expert, who testified that, of the combined total acreage on which the decreed water was used for irrigation, the Company's predecessor irrigated 32 acres (61% of the total acreage) and the Club's predecessor irrigated 20.41 acres (39% of the total acreage). Deeds from the Club's predecessors after the 1936 decree purport to convey an "undivided half interest" in the John Cerise Ditch. Much more recent documents, including records of the Club's predecessor and a 1990 bill sent from St. Jude's Co. to the Club's predecessor indicate that St. Jude's Co. owns 3.2 cfs of the 5.25 cfs of John Cerise Ditch rights (61%), and the Club owns 2.05 cfs (39%). Non-binding findings of fact from the first litigation also support this division.

¶ 38 This record supports the conclusion that St. Jude's Co. owns 61% (3.2 cfs) of the 5.25 cfs decreed to the John Cerise Ditch in Priorities 280 and 364, and that the Club owns 39% (2.05 cfs). Moreover, although the record contains conflicting evidence regarding the relative priority of those allocations (i.e., how those allocations should be taken from the priorities), the text of the 1936 decree itself, the joint nature of the decree proceedings, and subsequent deeds by predecessors of at least one of the parties all lead to the conclusion that the parties share equal priority by the two water rights. Because the weight of the evidence was contested and the water court evaluated credibility of both parties' expert witnesses in making its ruling, the water court's decision to award each party a portion of each priority, according to the ownership ratio discussed above, is affirmed.

## C.

¶ 39 St. Jude's Co. assigns error to the water court's refusal, per C.R.C.P. 37, to accept certain late supplemental disclosures by St. Jude's Co. before trial. A trial court's imposition of sanctions under Rule 37 is reviewed for abuse of discretion. *Warden v. Exempla, Inc.*, 2012 CO 74, ¶ 17, 291 P.3d 30, 34. A trial court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair. *Palizzi v. City of Brighton*, 228 P.3d 957, 962 (Colo.2010).

¶ 40 At issue are two sets of supplemental disclosures submitted on the same day, 22 days before trial. The first set, submitted pursuant to C.R.C.P. 26(a)(1), contained documentary evidence related to issues at trial, including diary entries, transcripts of testimony from a prior water adjudication, and photographs of the RFC Ditch. St. Jude's Co. submitted this disclosure 28 days after the deadline for discovery, as set by the court. The second set, submitted pursuant to C.R.C.P. 26(a)(2), contained expert opinions regarding the pipeline proposed by St. Jude's Co. and suggested terms and conditions for the Club's water applications. St. Jude's Co. submitted this disclosure 69 days after the deadline for expert rebuttal disclosures, as set by the court.

The water court excluded both sets of supplemental disclosures pursuant to C.R.C.P. 37(c)(1).

¶ 41 Rule 26 requires that parties disclose certain information and expert testimony by deadlines set by rule or court order. *See* C.R.C.P. 26(a)(1)–(2); *see also* Rule 11, Uniform Water Court Rules for All State Water Court Divisions (modifying C.R.C.P. 26 disclosure requirements for water cases). Under Rule 37, exclusion of late disclosures is proper unless the submitting party can demonstrate that nondisclosure was substantially justified or harmless. C.R.C.P. 37(c)(1); *Todd v. Bear Valley Vill. Apartments*, 980 P.2d 973, 979 (Colo.1999). The water court concluded that St. Jude's Co. failed to show that its late disclosures were either substantially justified or harmless, noting that the late disclosures either added little new relevant information or could have been disclosed earlier. In light of the largely duplicative content of the disclosures in question and the proximity of trial, this conclusion was not manifestly arbitrary, unreasonable, or unfair; and the water court therefore did not abuse its discretion.

**D.**

¶ 42 St. Jude's Co. also assigns error to the water court's award of costs and attorney fees to the Club pursuant to the Release Agreement. The water court awarded the Club fees for its efforts leading to summary judgment on the question of the Company's right to access land outside the easements granted in the Ditch Agreement. The court reasoned that those claims had been raised in the first litigation and released in the Release Agreement, thus triggering the fees provision. On appeal, St. Jude's Co. argues that the Ditch Agreement's dispute resolution provisions preempt those of the Release Agreement, and that in any event, the Company's claims addressed on summary judgment are not governed by the Release Agreement's fee provision because they arise instead under the Ditch Agreement.

¶ 43 As a threshold matter, the water court correctly concluded, in assessing fees, that the Ditch Agreement is not inconsistent with the Release Agreement in this regard. Both the Release Agreement and Ditch Agreement contain dispute resolution provisions. The Release Agreement's provision awards "reasonable attorney fees to the prevailing party in the event that it is necessary for any party to request judicial intervention to interpret or enforce any provisions of this Agreement." It also indicates that "[t]he Dispute Resolution provisions of the Ditch [Agreement] shall prevail to the extent that they are inconsistent with this section." The Ditch Agreement dispute resolution provisions refer disputes related to the RFC Ditch or the Ditch Agreement to arbitration, and award attorney fees and costs to the prevailing party in arbitration.

¶ 44 Because the Release Agreement expressly cross-references the Ditch Agreement and the two contracts were executed at the same time by the same parties, the agreements should be read together. *Harty v. Hoerner*, 170 Colo. 506, 463 P.2d 313, 314 (1969); *cf. E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 975 (Colo.2005). In the proceedings below, the water court ruled—at the Company's strenuous insistence—that the Club had waived its right to arbitration and that the Ditch Agreement's dispute resolution provisions therefore do not apply. That ruling is not at issue here. Because the dispute resolution provisions of the Ditch Agreement do not apply in this dispute, they cannot create any inconsistency with the Release Agreement. Therefore, to the extent the Release Agreement's fee provision applies to this dispute, its applicability is unaffected by the Ditch Agreement.

¶ 45 Turning to the heart of the matter, the water court correctly concluded, on summary judgment, that the Company's claims regarding access of Club land outside those easements granted by the Ditch Agreement are barred by the Release Agreement.[3]

---

3. In an attempt to show that the Ditch Agreement governs, St. Jude's Co. highlights many of its claims below related to land within the Ditch Agreement easements. These are not the claims for which the water court granted summary judgment and not the claims for which the court awarded costs and fees.

The Release Agreement "fully, finally, and forever" releases "any and all past and present actions, causes of action, suits, claims, ... rights, disputes, ... obligations, and liabilities of any kind or any nature whatsoever, known or unknown, asserted or not asserted, accrued or not accrued ... arising from the various events and claims" of the first litigation. As discussed, the first litigation concerned the Company's right to convey water across Club land using irrigation structures including the John Cerise Headgate. Unless expressly grounded in the Ditch Agreement, the Company's claims to extra-easement access are therefore barred by the express terms of the Release Agreement; and the Ditch Agreement does not purport to grant the extra-easement access claimed by the Company. Although the Ditch Agreement creates new rights of access for St. Jude's Co., those rights clearly do not extend to land outside the easements, such as the John Cerise Headgate, and the Ditch Agreement expressly "waive[s] any right to claim any additional or different easement by statute, use, acquiescence, prescription or otherwise."

¶ 46 For the reasons previously given, the water court did not err in rejecting the Company's claims to extra-easement access. Because the Club was forced to defend against those claims and prevailed, it was entitled to reimbursement under the Release Agreement's fee provision.

## IV.

¶ 47 Lastly, the Club requests attorney fees associated with the vindication of its rights under the Release Agreement on appeal, per the same fee provision. Colorado Appellate Rule 39.5 allows attorney fees on appeal where such fees are otherwise recoverable for the particular appeal, and where the party claiming attorney fees specifically requests them and states the legal basis therefor in its principal brief in the appellate court. In such circumstances, the appellate court may remand to the trial court or tribunal below for a determination of entitlement to or the amount of any attorney fees. *Id.; see also, e.g., Planning Partners Int'l, LLC v. QED, Inc.,* 2013 CO 43, ¶ 28, 304 P.3d 562, 569 (remanding case for a determination

whether prevailing party was entitled to appellate attorney fees pursuant to C.A.R. 39.5 and underlying contract). Because the Club prevailed in its defense of its fee award on appeal, it may collect appellate attorney fees for these efforts, as provided for by the Release Agreement. The Club's request for appellate attorney fees is granted in this respect and remanded to the water court for a determination of the amount of such fees.

## V.

¶ 48 Because the Club failed to demonstrate an intent to apply the amount of water for which it sought a decree to any beneficial use, as contemplated by either the constitution or statutes of the jurisdiction, the water court's order decreeing appropriative rights is reversed. Because the water court did not, however, misinterpret the various agreements at issue or other governing law, make any clearly erroneous factual findings, or abuse its discretion concerning discovery matters or the award of attorney fees, the remaining rulings of the water court to which error has been assigned by St. Jude's Co. are affirmed. The Club's request for appellate attorney fees expended defending those fees already granted according to the provisions of the Release Agreement is also granted, and the matter is remanded to the water court for a determination of the amount of those fees.

JUSTICE MÁRQUEZ concurs in part and dissents in part, and JUSTICE HOOD joins in the concurrence in part and dissent in part.

JUSTICE MÁRQUEZ, concurring in part and dissenting in part.

¶ 49 I join parts I, III, and IV of the majority's opinion affirming the water court's judgment to the extent that it resolved the parties' disputes over the meaning and effect of their agreements, quieted title to the priorities in this case, and ruled on various procedural issues. I also agree that the defendant-appellee is entitled to attorney fees incurred in vindicating its rights under the parties' release agreement in this appeal.

¶ 50 I write separately, however, because I disagree with the majority's conclusion that aesthetic, recreational, and piscatorial uses are categorically non-beneficial uses of water. Because I believe that such uses qualify as beneficial uses under Colorado water law, and because the record supports the water court's finding that Roaring Fork Club, L.L.C. ("the Club") needed the amount of water it claimed, I would affirm the judgment of the water court in this regard as well. Accordingly, I respectfully concur in part and dissent in part.

¶ 51 The majority initially questions whether aesthetic, recreational, and piscatorial uses can even rightly be described as "uses"—much less beneficial ones. Maj. op. ¶¶ 21–22. The majority supposes that these pursuits are "entirely passive," in that one merely "derives enjoyment from the water in its diverted state." *Id.* at ¶ 21. Yet it does not fully explain what distinguishes an "active use" from a passive use. *See id.* Given its example of the extraction of water during coalbed methane production, *see id.* (citing *Vance v. Wolfe,* 205 P.3d 1165, 1169 (Colo. 2009)), and the fact that the Club sought to use the water in the RFC Ditch (also referred to as "Spring Creek") partly for recreational fishing, I assume that the majority's distinction lies in applying water to some physical process or to produce some physical good, as opposed to obtaining enjoyment from the diverted water directly. Yet neither the Colorado Constitution nor the statutory definition of "beneficial use" draws such a distinction.

¶ 52 Although article XVI, section 6 of the Colorado Constitution prioritizes domestic uses over all other uses, and agricultural purposes over manufacturing, it does not limit appropriations to these uses. *See Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson,* 990 P.2d 46, 53 n.9 (Colo.1999) (noting that the meaning of "beneficial use" "tracks legislative enactments, court decisions, and, *principally, the acts of appropriators who control water to their purposes*" (emphasis added)); *accord* maj. op. ¶ 13. Likewise, although section 37–92–103(4), C.R.S. (2014), provides several examples of beneficial uses, it expressly states that these examples are not intended to limit the meaning of "beneficial use."[1] Thus, both the constitution and the statutory definition leave the term open to expansion beyond traditional uses of water.

¶ 53 In fact, one of the examples of beneficial use enumerated in the statutory definition suggests that the legislature intended the definition to encompass the types of uses at issue in this case. Section 37–92–103(4)(a) identifies as a beneficial use the storage of water for "recreational, fishery, or wildlife purposes," and the fishery purposes referenced in the statute plainly include recreational fishing. *See May v. United States,* 756 P.2d 362, 370–71 & n.11 (Colo.1988), *as modified on denial of reh'g* (June 6, 1988); *Three Bells Ranch Assocs. v. Cache La Poudre Water Users Ass'n,* 758 P.2d 164, 173 (Colo.1988). I see no meaningful distinction between recreational fishing in a reservoir and recreational fishing in a flow-through diversion. As amici point out, the need to clarify that recreational, fishery, or wildlife purposes can support a storage right may have arisen simply because of the rule that storage of water, by itself, is not sufficient to perfect an appropriation, *see, e.g., Upper Yampa Water Conservancy Dist. v. Wolfe,* 255 P.3d 1108, 1111 (Colo.2011). This likely explains why the legislature would identify

---

1. Section 37–92–103(4) states:

"Beneficial use" means the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made. *Without limiting the generality of the previous sentence,* "beneficial use" includes:
(a) The impoundment of water for firefighting or storage for any purpose for which an appropriation is lawfully made, including recreational, fishery, or wildlife purposes;

(b) The diversion of water by a county, municipality, city and county, water district, water and sanitation district, water conservation district, or water conservancy district for recreational in-channel diversion purposes; and
(c) For the benefit and enjoyment of present and future generations, the appropriation by the state of Colorado in the manner prescribed by law of such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree.
(Emphasis added.)

the *storage* of water for recreational, fishery, or wildlife purposes as a "beneficial use" without explicitly recognizing the right to a flow-through diversion for the same purposes. *See* § 37–92–103(4)(a).

¶ 54 Indeed, this court has previously recognized that recreational, fishery, or wildlife purposes extend to flowing water. *See City of Thornton v. City of Fort Collins,* 830 P.2d 915, 930–31 (Colo.1992) (acknowledging "recreational, piscatorial, fishery, and wildlife purposes" as beneficial uses in holding that water may be appropriated by removing it from its natural course toward another course).[2] And, long before *City of Fort Collins,* this court approved of decrees for flow-through rights for piscatorial purposes in *Faden v. Hubbell,* 93 Colo. 358, 28 P.2d 247, 248, 250–51 (1933). The majority suggests that piscatorial uses are limited to fish *production.* Maj. op. ¶ 24. That may have been the case in *Faden,* but this court has since expressly recognized recreational fishing as a beneficial use of flowing water—even if the private appropriation of water for this purpose *in a stream channel* is no longer permissible. *See City of Fort Collins,* 830 P.2d at 919, 930; *see also* § 37–92–103(4)(b).

¶ 55 The line the majority seeks to draw between "active," productive uses and "passive," recreational uses, maj. op. ¶ 21, is not only unmoored from the constitution, the statutes, and this court's precedent but is also conceptually untenable. The only authority the majority cites for its understanding of the term "use" is the dictionary definition of the verb "to use," meaning "to put into action or service." *See id.* (citing *Webster's Third New International Dictionary* 2523 (2002)). Yet the noun "use"—as in the phrase "beneficial use"—means "a particular service or end." *Webster's Third New International Dictionary* 2523 (2002). Recreational uses such as boating, swimming, and fishing, as well as simply enjoying the view, are all "ends" in and of themselves. Although such uses do not result in any measurable product (such as crops, or methane, or hydroelectric power), they do create recreation-

al value—in this case reflected by Club guests' willingness to pay for the amenity of Spring Creek and, conversely, their complaints when its flow was low. Hypothetically, guests could derive similar pleasure from a light show powered by a small-scale hydroelectric plant, or a flower garden or golf course irrigated with water diverted from the Roaring Fork River, and such applications of water would undoubtedly qualify as "beneficial uses." *Cf., e.g., Pub. Serv. Co. of Colo. v. FERC,* 754 F.2d 1555, 1558 (10th Cir.1985) (describing a hydroelectric plant with a direct-flow right of 1250 cubic feet per second ("cfs")); *Ackerman v. City of Walsenburg,* 171 Colo. 304, 467 P.2d 267, 272 (1970) (referencing direct-flow rights for irrigation of lawns and shrubs). I see no reason to distinguish between "active" uses of water that indirectly delight and "passive" uses that do so directly.

¶ 56 The majority next opines that the Club's proposed aesthetic, recreational, and piscatorial uses cannot be "beneficial" because they have no "objective limits, beyond which it becomes unreasonable, inappropriate, inefficient, or wasteful." Maj. op. ¶¶ 22–23. Yet these types of uses can be—and are statutorily required to be—limited to amounts "reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made." § 37–92–103(4). Water courts are well equipped to determine what amount of water is reasonable for recreational uses. *See Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.,* 109 P.3d 585, 602–03 (Colo.2005) (holding that the recreational in-channel diversion ("RICD") statute requires water courts to determine the amount of water necessary for a "reasonable recreation experience"). As with RICDs, expert testimony can establish how much water is necessary for a given aesthetic, recreational, or piscatorial use. *Cf. id.* at 603. For example, amici have furnished reports prepared by consulting firms quantifying the precise

---

2. The legislature subsequently limited the right to appropriate water *in stream* for such purposes to various governmental entities. *See* ch. 305, sec. 2, § 37–92–103(4), (7), 2001 Colo. Sess. Laws 1187, 1188–89. It did not, however, restrict recreational, fishery, or wildlife purposes to storage projects. *See id.*

amount of water needed to sustain habitat for fish and other aquatic life in various water features.

¶ 57 The value that Spring Creek creates, as well as the ability to determine the amount of water needed to achieve its purposes, suggests that aesthetic, recreational, and piscatorial uses satisfy the "beneficial use" requirement. So, is such a flow-through feature "tantamount to a 'forbidden riparian right,'" as the majority asserts? Maj. op. ¶ 25. I think not.

¶ 58 The majority cites *Colorado River Water Conservation District v. Rocky Mountain Power Co.*, 158 Colo. 331, 406 P.2d 798, 800 (1965), for the proposition that "'the right to the maintenance of the "flow" of the stream is a riparian right and is completely inconsistent with the doctrine of prior appropriation.'" Maj. op. ¶ 12. Yet, in that case, this court emphasized that "the first essential of an appropriation is the *actual diversion of the water*" from a natural stream. *Rocky Mountain Power Co.*, 406 P.2d at 800 (emphasis in original) (internal quotation marks omitted). The Club proposes to divert water from the stream for its flow-through feature; it does not request a right to a specific flow rate in the natural stream. Far from seeking "a right to the flow of water in its natural channel upon and over [its] lands," *Coffin v. Left Hand Ditch Co.*, 6 Colo. 443, 447 (1882), the Club seeks to remove water from the stream and apply it to arguably beneficial uses on its property, thereby increasing the property's value. This is the paradigmatic function of our state's system of prior appropriation. *See id.* at 446.

¶ 59 Further, permitting such a right would not "substantially undermine the intent evident in the legislature's instream flow and RICD provisions," maj. op. ¶ 25. One of the problems the legislature sought to address in limiting the availability of RICDs was the concern that private parties could tie up excessive amounts of water in the stream, with little financial outlay. *See Upper Gun-*

*nison*, 109 P.3d at 600–01. Diverting water for purposes of a flow-through right, by contrast, requires an appropriator to invest in a diversion structure. Thus, despite its concerns about the notion of *instream* appropriations, the legislature did not abrogate this court's holding in *City of Fort Collins* that an appropriator may divert water from a natural stream for beneficial uses including recreational, piscatorial, and wildlife uses. *Compare City of Fort Collins*, 830 P.2d at 920, 930–31 (holding that Fort Collins's "Nature Dam," which diverted water from the Poudre River into its historic channel, past a nature center, "removes ... water from its natural course and puts that water to a beneficial use"), *with* § 37–92–103(7) (defining "[d]iversion" as "removing water from its natural course or location" or "controlling water in its natural course or location" and limiting only the latter type of diversion to governmental entities). If the legislature concludes that additional restrictions[3] on flow-through diversions are necessary, it is of course free to enact those limitations.

¶ 60 It may be environmentally preferable to keep water in the stream rather than to divert it into flow-through features. Yet water courts have discretion to consider environmental impacts when ruling on applications. *See City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 86 (Colo.1996) ("Our decisions establish that the goal of maximum utilization must be 'implemented so as to ensure that water resources are utilized in harmony with the protection of other valuable state resources.'"). Further, if flow-through water rights begin to threaten the environment, the Colorado Water Conservation Board ("CWCB") may seek a minimum instream flow. *See* maj. op. ¶ 17 (citing § 37–92–102(3)). Here, I note, the CWCB did not object to the Club's application for additional water, and the water court approved the Club's augmentation plan to replace evaporative depletions from Spring

---

3. Typically, applications for water rights are not reviewed by state agencies or subject to public comment, as are instream flows and RICDs. *See* maj. op. ¶ 17 (citing § 37–92–102(3)–(4), (5)–(6)). They are, however, adjudicated by water courts,

and anyone may oppose an application by, for example, introducing evidence that the amount of water sought is excessive for the purposes stated in the application. *See* § 37–92–302(1)(b), C.R.S. (2014).

Creek.[4] Should the legislature ultimately determine that these sorts of appropriations are contrary to public policy, it can step in and enact further limitations, tailored to the scale and nature of the problem.

¶ 61 Instead, the majority today establishes a new rule categorically barring appropriations of flow-through water rights for aesthetic, recreational, and piscatorial purposes. Today's ruling calls into question numerous existing decrees and abolishes a well-established practice of the water courts in granting applications for such rights. Amici point to multiple decrees, issued in each of Colorado's seven water districts, for flow-through water rights for aesthetic, recreational, and piscatorial uses. For example, Water Division No. 3 has decreed direct-flow rights for "recreation, piscatorial, and fish and wildlife habitat"; Water Division No. 4 for "piscatorial and recreational use in a trout fishery," and, in another case, to supply a "Fishing Stream" and an "Amenity Stream"; and Water Division No. 5 for "piscatorial, recreation, and fish and wildlife habitat enhancement purposes."

¶ 62 This case also exemplifies the type of flow-through water right for aesthetic, recreational, and piscatorial purposes that I believe are valid. Diverting water into Spring Creek clearly creates benefits for the Club and its guests in the form of an aesthetic and fishing amenity. Further, the amount of water requested appears to have been reasonable, given the trial court's findings that the ditch could hold approximately 45 cfs as measured and that senior rights accounted for only about 22 cfs of that flow—leaving some 23 cfs unappropriated. The Club's Director of Fishing testified that higher flows create more-challenging fishing conditions

and help maintain suitable habitat for fish and aquatic invertebrates. Similarly, a report by the Club's expert explained that 21 cfs were necessary to "mimic natural hydrology in the Roaring Fork River." Based on this evidence, the water court concluded that 21 cfs was an appropriate quantity of water for the Club's purposes.[5]

¶ 63 In sum, I would hold that aesthetic, recreational, and piscatorial uses qualify as beneficial uses under Colorado water law. In my view, the broad statutory definition of "beneficial use" encompasses the direct enjoyment of water diverted from a stream in a flow-through feature—and should the legislature conclude that such uses do not qualify as "beneficial," it may so clarify, see *Vance*, 205 P.3d at 1172 & n.6. I also see no reason why the water necessary to serve these purposes cannot be objectively quantified; indeed, just such a quantification appears to have happened in this case. I would therefore affirm the water court's award of 21 cfs to the Club for aesthetic, recreational, and piscatorial purposes, in addition to its rulings on the other issues in this case. Accordingly, I respectfully concur in part and dissent in part.

I am authorized to state that JUSTICE HOOD joins in this concurrence in part and dissent in part.

---

4. The CWCB objected to the Club's proposed augmentation plan, but the Club ultimately agreed to curtail its diversion if the minimum instream flow was not satisfied.

5. Quantification should not be based solely on the applicant's subjective view of the amount of water necessary to serve the applicant's purposes. See *Upper Gunnison*, 109 P.3d at 603 (instructing the water court not to take "at face value" the assertions of an applicant in quantifying the amount of water needed for a "reasonable recreation experience"). The water court's findings here were not based solely on the Club's

own representations as to the amount of water needed. The water court heard conflicting testimony, based on the U.S. Army Corps of Engineers' permitting document for the construction of Spring Creek, suggesting that the feature was not designed to mimic the Roaring Fork River. It also explicitly referenced testimony suggesting that the ditch could not accommodate the 21 cfs requested. It found otherwise, however, and "factual findings of [the] water court that are supported by competent evidence in the record will not be disturbed on appeal," *Bijou Irrigation*, 926 P.2d at 82 n.75.